**Morris J. WARREN, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 79–162.**

District of Columbia Court of Appeals.

Argued Oct. 23, 1980.

Decided Oct. 9, 1981.

---

Richard S. Greenlee, Public Defender Service, Washington, D.C., with whom Silas J. Wasserstrom, Public Defender Service, Washington, D.C., was on the briefs, for appellant.

Richard C. Bicki, Asst. U.S. Atty., Washington, D.C., with whom Charles F. C. Ruff, U.S. Atty., John A. Terry and Harry R. Benner, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before KELLY, KERN and MACK, Associate Judges.

· KELLY, Associate Judge:

Upon retrial before a jury after a prior reversal by this court,[1] appellant Morris J. Warren was convicted of three counts of kidnapping while armed, D.C. Code 1973, §§ 22–2101, –3202; two counts of rape while armed, D.C. Code 1973, §§ 22–2801, –3202; two counts of armed robbery, D.C.

---

1. *Davis v. United States*, D.C.App., 367 A.2d 1254 (1976), *cert. denied*, 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 114 (1977).

Code 1973, §§ 22–2901, –3202; one count of assault with intent to commit sodomy while armed, D.C. Code 1973, §§ 22–503, –3202; and one count of assault with a dangerous weapon, D.C. Code 1973, § 22–502. He received seven concurrent sentences of fifteen years to life and two shorter concurrent sentences,[2] all to run consecutively to any other sentence previously imposed.[3] He appeals his convictions on many grounds, several of which require reversal. Before discussing these claims of error, however, we review the procedural and factual background of the case.

In 1972 and 1973, over a period of eight months, a dozen women reported that they were kidnapped by persons riding in a green Chevrolet Vega or similar car and that they were sexually assaulted by their abductors. Descriptions of the car and of the driver led police to arrest one John Davis on February 11, 1973. Appellant was arrested on April 21, 1973. The two men were tried jointly in September 1973. The jury found appellant guilty of eleven counts relating to four separate incidents of kidnapping and sexual assaults.[4] On December 30, 1976, appellant's convictions were reversed because of his prejudicial misjoinder with John Davis. *Davis v. United States,* D.C.App., 367 A.2d 1254 (1976), *cert. denied,* 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 114 (1977).

Before his retrial, appellant moved to dismiss the indictment for want of a speedy trial and because of prejudical pretrial publicity. He also moved to sever the counts of the indictment and to suppress post-conviction statements made to a probation officer who prepared the presentence investigation report and statements made later to two police officers. The government in turn moved pretrial to introduce the transcripts of the prior trial testimony of complaining witnesses Sharon Williams, Debra Waters, Marilyn Reed and Linda Jenkins.

On May 30, 1978, then Superior Court Chief Judge Harold H. Greene denied each of appellant's motions except the one to suppress the post-conviction statements made to the two police officers. He ruled admissible the prior testimony of all of the complainants except Linda Jenkins, determining that Sharon Williams had died in an unrelated incident since the first trial, that Debra Waters could not be found, and that Marilyn Reed was "psychologically unavailable." As a result of the court's refusal to allow the government to perpetuate the prior trial testimony of Linda Jenkins, the government was left without evidence to prosecute the offenses related to her rape and abduction.

Retrial began on October 24, 1978. In that trial, the jury was instructed that appellant had previously been convicted by another jury, but that they were to disregard the outcome of the prior trial. The absence of the complaining witnesses was also briefly explained to the jury.

In its opening statement, the government explained to the jury that it expected the testimony (from the transcripts) to show that on different occasions three women were offered rides in a green Vega and taken to secluded locations where they were sexually assaulted by appellant personally or in his presence. The prosecutor's principal argument was the inconsistency between appellant's denial at his first trial of any knowledge of the complaining witnesses and his admission, in a presentence report, to sexual relations with two of these women whom he alleged consented to those relations. In his defense, appellant argued only the likelihood of misidentification.

---

**2.** Appellant was sentenced to three to nine years for the assault with a dangerous weapon conviction and one to five years for the assault with intent to commit sodomy while armed conviction.

**3.** Appellant is presently serving a life sentence in Maryland for murder.

**4.** The original indictment filed against appellant and his codefendant contained a total of eighty-four counts, relating to twelve separate abductions. Forty-five counts against Davis were dismissed without prejudice before trial. Appellant was named only in the counts relating to four of these abductions.

The government presented the prior testimony of the three female complainants by having secretaries from the United States Attorney's office play the role of the complainants. The prosecutor read the questions asked by the government at the first trial and the secretary responded by reading the complainant's answers. The secretaries also read the questions asked by the attorneys for appellant and his codefendant, and the witnesses' answers upon cross-examination. Portions of testimony from a pretrial hearing on a motion to suppress identifications were read in a similar manner to the jury.

In contrast to his decision to testify at his joint trial with codefendant Davis, appellant declined to take the stand at his retrial and the defense put on no evidence. On appellant's motion for judgment of acquittal, the court dismissed the counts relating to Linda Jenkins, concerning whose abduction no evidence had been presented. It also dismissed two counts of assault with a deadly weapon, ruling that they merged into the charges of armed kidnapping. Appellant was convicted on all remaining counts.

## I

After pretrial hearings on November 28, 1977 and April 18, 1978,[5] then Chief Judge Harold H. Greene disposed of pending motions of both parties by written order on May 30, 1978. Four of the seven assignments of error in this appeal pertain to the rulings contained in that order.

First, appellant contends that it was error to allow the prior trial testimony of complainants Marilyn Reed and Debra Waters to be read to the jury at his retrial.

5. At the trial court's request for additional expert testimony in connection with the government's motion to introduce the prior trial testimony of unavailable witnesses, a second hearing was conducted on April 18, 1978.

6. Appellant has not challenged the finding that he had an adequate opportunity to cross-examine the testimony of Debra Waters and Marilyn Reed at his first trial, nor has he raised any other questions relating to the reliability of that testimony. In the recent Supreme Court case of *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the confrontation clause

The court's May 30 order reflects precise consideration of the limits of the Sixth Amendment's confrontation clause and of the hearsay exception for prior recorded testimony, explaining that constitutional and common law tests require the government to show (1) an adequate opportunity at the prior proceeding for the defendant to cross-examine the witness whose testimony is sought to be introduced, and (2) the unavailability of that witness. The court ruled that appellant had an adequate opportunity to cross-examine all four witnesses at his first trial,[6] but that only three of these witnesses were unavailable so as to justify the introduction of their prior trial testimony.

■ The common law of this jurisdiction recognizes that prior recorded testimony is admitted into evidence as an exception to the hearsay rule when

(1) the direct testimony of the declarant is unavailable, (2) the former testimony was given under oath or affirmation in a legal proceeding, (3) the issues in the two proceedings were substantially the same, and (4) the party against whom the testimony now is offered had the opportunity to cross-examine the declarant at the former proceedings. [*Henson v. United States*, D.C.App., 399 A.2d 16, 19, cert. denied, 444 U.S. 848, [100 S.Ct. 96, 62 L.Ed.2d 62] (1979) (quoting *Alston v. United States*, D.C.App., 383 A.2d 307, 315 (1978)).]

Appellant challenges the trial court's findings only with regard to the first of these factors, *i. e.*, unavailability. He concedes

of the Sixth Amendment was interpreted to allow introduction of prior recorded testimony where (1) the declarant is unavailable, and (2) the testimony is reliable. Reliability is partly established by showing that defendant had an adequate opportunity to cross-examine at the prior proceeding, and by the identity of parties and issues at the two proceedings, by the fact that the prior testimony was given under oath and that the defendant was represented by counsel. *See California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

that the court correctly permitted the reading of Sharon Williams' prior trial testimony, agreeing that the witness' death clearly established her unavailability.

With respect to Marilyn Reed, appellant's contentions are that (1) the admissibility of her testimony is governed by D.C.Code 1973, § 14–303, which requires exclusion here because Reed was not "incapable of testifying" under the plain meaning of that statute, (2) the record does not support the conclusion that she was unavailable to testify at trial even under any acceptable common law test of psychological unavailability, and (3) the trial court failed to use proper procedures to evaluate her unavailability.[7]

We disagree with appellant's argument that since D.C.Code 1973, § 14–303 "appears to be applicable," the court should have construed that statutory definition of witness unavailability instead of applying the common law exception to the hearsay rule for prior testimony of unavailable witnesses.[8] Section 14–303 treats only the admissibility of former testimony of parties and is silent on the question of former non-party witness testimony. Since none of the four witnesses whose former testimony the government sought to introduce were parties in this case, § 14–303 is inapposite. In the words of the district court in *United States v. Franklin*, 235 F.Supp. 338, 340 (D.D.C.1964): "[b]y its clear language, [section 14–303] is applicable only where the testimony sought to be used was given by a party and where the later proceeding in which it is offered is 'between the same parties or their legal representatives'."

Appellant's objection that such an interpretation of § 14–303 means that the government could never use the statute to introduce testimony of deceased or "incapable" witnesses, as those persons would be mere "witnesses" and not "parties," supports the conclusion that § 14–303 was not designed as the exclusive means of introducing former testimony and has not displaced the common law in the area of witness unavailability.[9] It is precisely because of the limited applicability of the statute that the question of the admissibility of the prior trial testimony was properly decided below as a matter of constitutional and common law.

Appellant argues that even under a common law test of witness unavailability, the trial court improperly permitted Marilyn Reed's testimony to be introduced. As stated above, we are not bound by statutory limitations, since the question of witness unavailability, in contrast to party unavailability, has not been legislatively defined in the District of Columbia. On the other hand, constitutional limitations have recently been set in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), where the Supreme Court said that the test of Sixth Amendment unavailability was not met "unless the prosecutorial authorities have made a *good faith effort* to obtain [the witness'] presence at trial." *Id.* at 74, 100 S.Ct. at 2543 (emphasis in original) (quoting *Barber v. Page*, 390 U.S. 719, 724–25, 88 S.Ct. 1318, 1321–22, 20 L.Ed.2d 255 (1968)). This rule applies to all cases of witness unavailability, but is moderated by the recognition that "[t]he lengths to which the

7. The court found that Reed's testifying "would be likely to lead to a severe psychosis, even possible suicide" and would "be as likely to be a grave threat to her health and life as to compel the testimony of the individual with an acute heart condition."

8. D.C.Code 1973, § 14–303 provides:
 When a party, after having testified at a time while he was competent to do so, dies or becomes incapable of testifying, his testimony may be given in evidence in any trial or hearing in relation to the same subject-matter between the same parties or their legal representatives, as the case may be; and in

such a case the opposite party may testify in opposition thereto.

9. We therefore need not address the government's alternative arguments that even if § 14–303 is applicable, it either codifies only some of the common law regarding witness unavailability or that it should be read broadly to encompass the question of psychological unavailability. Judge Greene noted that while the statute was not properly applicable to the instant question, "its standards are analogous to the common law standards on witness unavailability."

prosecution must go to produce a witness ... is a question of reasonableness." *Id.* (quoting from Justice Harlan's concurring opinion in *California v. Green,* 399 U.S. 149, 189 n.22, 90 S.Ct. 1930, 1951 n.22, 26 L.Ed.2d 489 (1970)). Therefore, the constitutional question appears to be at what point, if any, is it no longer reasonable to require the government to produce witnesses at the risk of their psychological health. We need not resolve this abstract question here; we pose it only to underscore the inherent flexibility and ambiguity of the constitutional standard and to set the outer boundaries of our task of common law interpretation.

Professor McCormick lists the following recognized categories of witness unavailability: [10] death, absence, physical disability, mental incapacity (insanity), failure of memory, exercise of a privilege, refusal to testify and supervening disqualification. McCormick, Evidence § 253, at 609–12 (1972). He states however that "[i]n principle probably anything which constitutes unavailability in fact ought to be considered adequate" but that the various categories have emerged as a result of recurring fact situations. *Id.* at 609.

We are here asked to recognize a type of witness unavailability which, to our knowledge, has been expressly sanctioned in only two cases, one from California, and the other from New York. The courts in both cases have done so by interpreting codified rules of evidence defining medical unavailability to include, in California, a "then existing physical or mental illness or infirmity," [11] and in New York, inability to attend "by reason of ... insanity, sickness or infirmity." [12]

In *People v. Gomez,* 26 Cal.App.3d 225, 230, 103 Cal.Rptr. 80, 83–84 (1972), the California statute was interpreted to require a showing that "the illness or infirmity must be of comparative severity; it must exist to such a degree as to render the witness' attendance, or his testifying, relatively impossible and not merely inconvenient." In *Gomez,* the witness' unavailability under this standard was established by two psychiatrists who testified that she was "very vulnerable to stress; she had a tendency to psychomotor seizures which were difficult to diagnose and treat" and that her present and future mental health might well be injured by testifying before the court. *Id.* at 228, 103 Cal.Rptr. 82.[13]

The decision in *People v. Lombardi,* 39 App.Div.2d 700, 701, 332 N.Y.S.2d 749, 750–51 (1972), *aff'd,* 33 N.Y.2d 658, 348 N.Y.S.2d 980, 303 N.E.2d 705 (1973), *cert. denied,* 416 U.S. 906, 94 S.Ct. 1611, 40 L.Ed.2d 111 (1974), upheld a lower court finding that it would endanger the witness' health to testify again, where testimony by the witness' husband and her psychiatrist could reasonably have satisfied the court that had the witness "been required to appear and testify in person ... her mental and physical health would have been seriously jeopardized" and would have resulted in a "further and perhaps successful attempt at suicide." The witnesses in both the California and New York cases were rape victims.

Contrary to appellant's contentions, the trial judge's reference to these case interpretations of out-of-state statutes was a proper means of obtaining guidance in formulating the District's common law on the

---

**10.** It is useful to note in such an analysis that "while the rather general practice is to speak loosely of unavailability of the witness, the critical factor is actually the unavailability of his testimony." McCormick, Evidence § 253, at 608 (1972).

**11.** Cal.Evid.Code § 240(a)(3).

**12.** N.Y.Code Crim.Proc. § 8(3)(d). The subsequent codification in N.Y.Crim.Proc. Law § 670.10 (McKinney 1971), replaced "insanity, sickness or infirmity" with "illness or incapacity." "Illness" within this section may be either

physical or mental. *People v. DelMastro,* 72 Misc.2d 809, 813, 339 N.Y.S.2d 389, 393 (1973).

**13.** A later case applying the California statute and the *Gomez* standard rejected the lower court's finding of unavailability where no medical testimony was presented concerning the witness' present mental state and the only testimony concerning her medical condition related to the anguish and physical effects suffered as a result of her first court appearance. *People v. Williams,* 93 Cal.App.3d 40, 155 Cal.Rptr. 414 (1979).

question of witness unavailability. Since it is our duty, as judges, to adapt the common law to reflect evolving norms and new circumstances, including new scientific and medical understanding, it is wise to look to other considered legislative and judicial judgments.

It is also useful to note Fed.R.Evid. 804(a)(4), and the corresponding Uniform Rule of Evidence, one or the other of which has been adopted by nineteen states,[14] and which provide that a declarant is unavailable if he "is unable to be present or to testify at the hearing because of death, or *then existing* physical or *mental* illness or *infirmity.*" (Emphasis added). The only case of which we are aware applying the mental infirmity part of this definition is *United States v. Benfield*, 593 F.2d 815 (8th Cir. 1979), where appellant's conviction was reversed because of a violation of his Sixth Amendment right to confront the government's witness face-to-face. On testimony by a psychiatrist that the witness should not be required to endure a trial situation or to face her kidnapper because of her mental condition,[15] the lower court agreed to allow the witness to testify at a videotaped deposition instead, later to be introduced at trial, at which defendant's counsel, but not the defendant, would be present. The defendant was allowed to observe the proceedings on a monitor and interrupt them to summon his lawyer. The witness, however, was kept unaware of the defendant's presence. The Court of Appeals in *Benfield* did not object to the finding of unavailability, but reversed on the basis of reliability. It found that the purpose of face-to-face encounter is to assure proper cross-examination by reinforcing the witness' recollection, veracity and communication. In the present case, unlike in *Benfield*, appellant's physical presence at the first trial when Marilyn Reed testified against him, satisfied this function.

In ruling as he did, Chief Judge Greene cautiously extended the traditional definition of witness unavailability to include psychological unavailability of the type demonstrated in the case of Marilyn Reed, but to exclude the lesser degree of psychological infirmity demonstrated by Linda Jenkins. After evaluating the testimony of two psychiatrists, one of whom he personally appointed to obtain an independent, second opinion, he excused Reed from testifying because the experts agreed that she "would undergo far greater mental anguish than normally accompanies court appearances of the victims of rapes (and presumably other such crimes as kidnapping, terrorism, and hijacking) and that her appearance in court ... would be likely to lead to severe psychosis, even possible suicide." [May 30th opinion, p. 27.]

We reject appellant's claim that the evidence does not support this finding. At the November 28, 1977 hearing, Dr. Leon Yochelson testified that Reed was suffering from a severe mixed psychoneurosis with particular emphasis on depressive mood, phobic reaction and anxiety. He found that the depth of her depression had reached suicidal levels and that suicidal tendencies were still present. Dr. Yochelson's testimony was based on two interviews as well as police reports and testimony from Marilyn Reed's prior court appearance. He learned that since the time of the rape incident, Reed had changed her name, her religion and her entire lifestyle. Yochelson testified that, unlike in the usual case, time and the change in lifestyle had not succeeded in blunting the emotional and psychological effects of the violence she had suffered, and that the trauma of another court appearance would most likely shatter her fragile adaptation to society, possibly leading to permanent psychological injury.[16]

14. 4 J. Weinstein & M. Berger, Weinstein's Evidence, § 804(a) [02], at 804–51, –52 (1979 & 1980 Supp.).

15. The discussion of the witness' mental condition in *Benfield* reveals only that her infirmity was related to her abduction and gradually

developed after that event until she could no longer tolerate crowd situations and was unable to work.

16. In his written report to the United States Attorney, Yochelson stated that upon sugges-

Following the testimony of Dr. Yochelson, Judge Greene appointed Dr. Sheila Hafter Gray to conduct an independent psychiatric evaluation of Reed and Jenkins. This he did, not necessarily as appellant contends, because he discounted the testimony of the government's psychiatrist, but rather because he was sensitive to the extraordinary nature of the government's motion and needed additional evidence to convince him that these witnesses should not be required to testify. In appointing an impartial psychiatrist, he expressly followed the only local precedent on the question of psychological unavailability. In one of the well known Hanafi trials, *United States v. Griffin* (D.C.Super.Ct. No. 47902–73), the government contended that the sole eyewitness to the mass murders for which the defendant was on trial, was unavailable to testify for reasons of both physical and psychological health. In the *Griffin* case, an independent psychiatrist was also appointed, notwithstanding the testimony of three other doctors who were intimately familiar with the witness' physical and mental condition.[17]

Dr. Gray diagnosed Reed as suffering from a narcissistic personality disorder substantial enough to be considered a mental defect, and as vulnerable to transient psychosis as a result of stress. She informed Dr. Gray that she would rather be jailed for contempt than testify again. Dr. Gray found Reed's lifestyle change to have effected merely a surface adjustment to reality and concluded that "there would be a small but very real risk that she would become temporarily psychotic as a result of

testifying" and that "in her case the suffering would be greater than one would ordinarily see."

Dr. Gray did state that the risk of damage would be minimized if Reed's religious group were to actively support her in testifying against the defendant. The court was apparently not reassured by this possibility and, we think, fairly sifted the experts' opinions in especially relying on findings substantially agreed to by both psychiatrists. In disallowing introduction of the prior trial testimony of Linda Jenkins, the judge noted the experts' disagreement regarding the relative harm likely to be suffered by that witness in relation to the burden carried by the average victim-witness. In contrast to the conflicting prognosis for Jenkins, the experts substantially agreed on the severity of the injury to befall Marilyn Reed were she forced to relive the events of her rape through another court appearance.

■ The ruling below was not only supported by the evidence, but was also a reasonable construction of the witness unavailability rule. We do not intend to sanction a new category of medical unavailability in all cases where witnesses are likely to suffer adverse emotional or psychological effects as a result of testifying against their assailants. But in the extreme circumstances presented here, we agree that the grave risks to the witness' psychological health justify excusing her live in-court testimony. The expert testimony relating to Reed's mental health established that there was both a high likelihood of temporary psychological injury, perhaps even psycho-

---

tion that Reed reconsider the possibility of testifying at a retrial, "the sense of panic and the return of depressive symptoms were so strong that she could not even conceive of reentering the courtroom or even being questioned in a more private setting about what she had been through." He concluded that "[T]here is great risk in pressuring Marilyn Reed to testify again. She is very likely to suffer an intensification of the psychological injury she had previously sustained, the probability of panic states and serious emotional depression being very high. Further, it is likely that should she be forced to testify, the resultant psychological injury would

be severely incapacitating over an extended period of time, perhaps even permanently."

17. We cannot determine whether the admission of the prior trial testimony in *Griffin* was made under more compelling circumstances than those presented here. On the one hand, the "unavailable" witness had suffered very real physical effects of the crime. She had been shot in the head, and bullet fragments were still implanted in her skull. On the other hand, she had testified on three prior occasions with the same physical handicap and, moreover, new evidence of misidentification rendered her prior testimony especially suspect.

sis, and a possibility of permanent psychological injury. We also are persuaded of the correctness of the trial court's ruling because of the expert's agreement on the comparative severity of this victim's probable reaction to testifying again.[18]

Appellant's final challenge to the admission of Marilyn Reed's testimony is procedural. He asserts that the court abused its discretion by (1) failing to take Reed's testimony and to personally observe her demeanor, (2) not issuing a subpoena for trial to test her asserted refusal to testify, and (3) failing to reevaluate her mental health at the time of trial. We conclude to the contrary, that by appointing an independent psychiatrist, the trial judge went out of his way to conduct a thorough evaluation of Marilyn Reed's mental health. For him to have personally observed the witness in court would have been pointless in view of his lack of psychiatric expertise. To request her to testify in this manner, just to test her resistance to judicial process, would have unnecessarily burdened the very person whose well-being the court sought to protect.

The delay between the dates the psychiatrists conducted their respective examinations of Reed and appellant's trial does not affect the validity of the trial court's order, nor render admission of her testimony reversible error in the absence of any objection at trial. The trial court's failure to request, *sua sponte*, an updated report of psychological health is supported by a reasonable presumption of continuing mental condition and by the necessity to both parties of obtaining a ruling on the admissibility of the prior testimony sufficiently in advance so that both sides might prepare for trial accordingly. We find no abuse of discretion in the failure to obtain updated psychiatric evaluations.

■ Appellant's challenge to the admission of Debra Waters' prior trial testimony also rests on a claim of improper timing. Since what must be established is the witness' unavailability at the time of trial,[19] appellant contends that the court should have made a renewed finding of Waters' unavailability at the opening of his retrial, which was almost one year after testimony by Detective Virgil Hopkins about his unsuccessful attempts at locating the witness. Appellant concedes that as of the date of his testimony, Hopkins' efforts were genuine, bona fide and reasonable, as found by the trial court. He insists, however, that the absence of an updated determination of unavailability is plain error. In our preceding discussion on the timing of the court's ruling on the admissibility of Marilyn Reed's testimony, we explained that it was reasonable for the trial court to have relied on a presumption of continued mental condition. Similarly here, the trial judge reasonably relied on a presumption that the status quo would remain unchanged, unless one of the parties suggested otherwise. Neither appellant, nor the government, whose good faith efforts to locate the witness must continue till the trial date,[20] informed the court of a change in the status quo. The government had met its burden of showing Waters' unavailability and the evidence it presented left no hope that the witness might yet be located with the pas-

---

18. Adopting a variation on the questions posed to the court-appointed psychiatrist, in the *Griffin* case, *supra*, by Judge Leonard Braman, we think that the following matters are relevant to the question of psychological unavailability: (1) the probability of psychological injury as a result of testifying, (2) the degree of anticipated injury, (3) the expected duration of the injury, and (4) whether the expected psychological injury is substantially greater than the reaction of the average victim of a rape, kidnapping or terrorist act. Just as in the case of physical infirmity, it is difficult to state the precise quantum of evidence required to meet the standard of unavailability. The factors should be weighed in the context of each other, as well as in the context of the nature of the crime and the pre-existing psychological history of the witness.

19. *See Government of the Virgin Islands v. Aquino*, 378 F.2d 540, 549 (3d Cir.1967).

20. *Barber v. Page, supra*, 390 U.S. at 725, 88 S.Ct. at 1322.

sage of time or by some other avenue of discovery.[21]

With respect to the Sixth Amendment standard of unavailability, the Supreme Court recently stated that "The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists ... 'good faith' demands nothing of the prosecutor." *Ohio v. Roberts, supra,* 448 U.S. at 74, 100 S.Ct. at 2543. Here, in the absence of evidence that there was any possibility of locating Debra Waters, no matter how remote, we cannot say that the government failed to meet its good faith effort requirement. Thus the court's failure to request a fresh recitation of the search efforts and a demonstration of fruitless continued good faith efforts (which the government had promised to conduct and was obliged to make), was neither an abuse of discretion, *Milstead v. States,* 155 Ga. App. 407, 270 S.E.2d 820 (1980); *Napier v. State,* 377 So.2d 1135 (Ala.1979); *People v. Starr,* 89 Mich.App. 342, 280 N.W.2d 519 (1979) (determination of due diligence will not be overturned on appeal unless clear abuse of discretion shown); *Commonwealth v. Jackson,* 463 Pa. 301, 344 A.2d 842 (1975) (admissibility of prior testimony within discretion of trial judge), nor plain error.

## II

Appellant claims that he should have been tried separately for each rape incident and that the court erred in denying his motion to sever counts, pursuant to Super. Ct.Cr.R. 14. Both the motions judge and the trial judge were presented with the severance question and ruled in the alternative (1) that it was foreclosed to them either by the res judicata effect of our decision in *Davis, supra,* or by the law of the case as established in the joint trial upon which the *Davis* appeal was predicated, and (2) that an independent review of the merits convinced them of the propriety of joinder.

■ Since the critical factor in determining the merits of a Rule 14 severance motion is the prejudice to the movant,[22] the trial court correctly considered anew the desirability of severance. The different posture of appellant's case on retrial affected the type of prejudice to which he was susceptible then, as compared to the prejudice to which he was subject at the prior trial. For example, factors relating to prejudice which differed in the two proceedings were: (a) the number of offenses involved, and (b) the nature of the complaining witnesses' testimony. Appellant was in effect retried separately for three rape offenses as opposed to four out of seven rapes involved in the prior joint trial. Thus there were fewer crimes to be cumulated and confused in the minds of the jury. However, this factor is offset by the fact that in contrast to the live testimony by the rape victims at the prior proceeding, there was no demeanor evidence on their part at retrial because their prior testimony was read to the jury by government secretaries. This factor could have heightened the jury's tendency to confuse and cumulate the evidence. Since appellant's severance motion presented a new question of prejudice, its resolution was not dictated by res judicata or the law of the case doctrine. We therefore review the trial court's independent consideration of the severance motion.

We have recently held that, "[a]n order denying severance under Rule 14 may be reversed only upon a clear showing of abuse

21. Hopkins testified that over a period of months he searched for Debra Waters by checking with the Civil Service Commission, the Postal Inspector's Office and public assistance, by verifying criminal and motor vehicle records, by issuing subpoenas to the telephone company and the Credit Bureau. Hopkins also visited Waters' last three known addresses and former places of employment and subpoenaed local colleges to check whether she had been on their rolls. Hopkins was assisted by the Federal Bureau of Investigation in his efforts to locate Waters.

22. Superior Ct.Cr.R. 14, codified in D.C.Code 1973, § 23–313 states in pertinent part: "If it appears that a defendant or the government is *prejudiced* by a joinder of offenses ..., the court may order an election or separate trial of counts, ... or provide whatever other relief justice requires." (Emphasis added).

of discretion." *Winestock v. United States,* D.C.App., 429 A.2d 519, 526 (1981) (citations omitted). Appellant has not expressly alleged that the court's denial of his severance motion rose to the level of a clear abuse of discretion, nor are we able to discern such a defect ourselves.

■ The trial court justified joinder of offenses in this case under the "reciprocally admissible" exception to the rule that joinder of offenses of a similar character creates a substantial risk of prejudice.[23] The test of reciprocal admissibility is satisfied here because evidence of each of the joined offenses would be admissible at the trial of the others as relevant to showing the "identity of the person charged with the commission of the crime on trial." *Drew v. United States,* 118 U.S.App.D.C. 11, 16, 331 F.2d 85, 90 (1964).[24] Identity-type reciprocal admissibility, in so-called signature crimes, permits joinder where the offenses are so nearly identical in method because of a concurrence of unusual and distinctive characteristics, that it is likely that they were committed by the same person. *Bridges v. United States,* D.C.App., 381 A.2d 1073, 1075 (1977), *cert. denied,* 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1978). But joinder in such cases "does not require that a *single* characteristic be so unique as to lead to the conclusion that all [offenses] were committed by the same person." *Id.* at 1078 (emphasis in original). Rather, "[i]t is by adding circumstance to circumstance that we obtain a composite feature or mark which as a whole cannot be supposed to be associated with more than a single object." *Id.,* quoting 2 Wigmore on Evidence § 411, at 385 (3d ed. 1940).

■ In this case, the composite features of the crimes for which appellant was tried indicate that the trial court properly exercised its discretion in denying severance because the crimes were so similar as to suggest the identity of the same wrongdoers. All involved the abduction and rape of young women around twenty years old. Perhaps the most distinctive shared characteristic of the crimes was that the transportation vehicle in each case was described as a small green sportscar with black interior and bucket seats which two of the complainants identified as a Chevrolet Vega with blue and white license tags, and the third as resembling a Pinto. Each complainant was standing on the street, waiting for transportation—two for cabs, and the other for a bus—when she was accosted. The abductions all took place after sunset and before midnight. The complainants were driven to deserted locations, threatened with deadly weapons—a knife in one case, a revolver in the other two—and then raped. In all instances, the driver of the car, who was identified as John Davis,[25] raped the complainants in the presence of one or more accomplices, while one of the accomplices held the weapon. In two instances, the victims were also raped by an

---

**23.** This rule and its exceptions are set forth in *Bridges v. United States,* D.C.App., 381 A.2d 1073, 1075 (1977), *cert. denied,* 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1978):

When, however, offenses of a "similar character" are joined for trial, there is a substantial risk of prejudice.... Our cases therefore require that when joinder of offenses is based on the fact that the crimes are of a "similar character," a motion to sever should be granted unless (1) the evidence as to each offense is separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass, or (2) the evidence of each of the joined crimes would be admissible at the separate trial of the other, citing *Tinsley v. United States,* D.C.App., 368 A.2d 531 (1976); *Drew v. United States,* [118 U.S.App.D.C. 11, 331 F.2d 85 (1964)].

**24.** The reciprocal admissibility test is also satisfied where evidence of each of the joined offenses would be relevant to prove motive, intent, absence of mistake or accident, or a common scheme or plan. *See Drew v. United States, supra* at 16, 331 F.2d at 90.

**25.** All three complainants described the driver as a Negro male, medium complected, stocky and bearded. His height was estimated at 5'9" by Sharon Williams; 5'8" by Marilyn Reed; Debra Waters merely described him as short. The three complainants respectively guessed his age to be between 28 and 30 years, 25 years and 27 years.

accomplice. The accomplice identified as appellant [26] did not rape any of the complainants, he merely assisted in one case by holding the victim's legs, and in another, he placed his penis between the victim's legs.

The abductions of Williams and Reed occurred the same night, about five hours apart. Both complainants were raped in apartment buildings, one in a laundry room, the other in an abandoned basement apartment. The weapon used in both instances was a revolver. The Waters abduction took place five months earlier, at the same hour as the Reed abduction. Debra Waters was offered a ride, just like Marilyn Reed, by a man alone in a green sportscar. (Sharon Williams was forced into the car at gunpoint.) In both cases, the driver stopped about one block later to pick up appellant, and in Marilyn Reed's case, a second unidentified passenger as well. Following the rapes, both Debra Waters and Marilyn Reed were driven back to other locations in the District.

In sum, the green sportscar, the teamwork aspect of the crimes, the age of the victims, the fact that they were picked up on public streets after dark, the transportation across town to unfamiliar secluded locations, and the threats with a deadly weapon were unusual and distinctive factors common to all three crimes. When the additional similarities between the Williams and Reed rapes on the one hand and the Reed and Waters rapes on the other hand are also considered, the facts combine to form a unique signature and point to the *modus operandi* of a single team of wrongdoers. Therefore, the trial court's refusal to sever the counts was not an abuse of discretion because evidence of each crime would have been admissible at the trial of the others to show the identity of appellant. *See Bridges v. United States, supra* (trial court did not abuse its discretion in refusing to sever four rape charges where rapes occurred within six-month period, between 1:00 a. m., and 4:45 a. m., in same general area of southeast Washington, D.C., assailant entered victims' apartments through rear, awoke them, threatened them with a weapon and demanded silence and submission, raped them and fled through rear); *Arnold v. United States,* D.C.App., 358 A.2d 335 (1976) (en banc) (denial of severance motion not abuse of discretion where two rapes with which defendant was charged involved ride offers by driver of light blue Volkswagen, change of driver's attitude from a friendly to threatening one, successful demand for sexual intercourse and, finally, return of victim to her destination).

### III

In a third allegation of error, appellant asserts that the twenty-two and a half month cumulative delay between his arrest and first trial and between this court's remand and his retrial, denied him the right to a speedy trial.[27] Applying the four-prong test of *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), we find *no such constitutional violation despite the prima facie merit of appellant's claim.*[28]

The first part of the Supreme Court's analysis in *Barker v. Wingo, supra,* requires us to consider the length of pretrial delay. Five months elapsed from appellant's arrest on April 21, 1973 to the beginning of his

---

26. Appellant was described by the complainants as a Negro male in his twenties with a short bush haircut. Sharon Williams stated he had two broken front teeth, was about 5'9", clean shaven and about 23 years old. Marilyn Reed said he had a chipped tooth, scar, pimples, was dark complected, clean shaven, tall and wore a dashiki and glasses. Debra Waters described him as dark skinned, in his mid twenties and with a scar on his face.

27. In accordance with our decision in *United States v. Alston,* D.C.App., 412 A.2d 351 (1980) (en banc), appellant has expressly refrained from including in his speedy trial claim the period of appellate delay occasioned by the appeal of his joint trial with John Davis. Nor does appellant challenge that delay as violative of his due process rights.

28. A delay of more than one year suffices to establish a prima facie speedy trial claim, *see,*

first trial on September 21, 1973.[29] Another seventeen and a half months passed between our mandate to the trial court following denial of the government's petition to rehear *en banc* our decision in *Davis v. United States, supra,* and the commencement of appellant's retrial on October 24, 1978. Both periods should be considered in determining the total length of the pretrial delay. *See United States v. Alston,* D.C.App., 412 A.2d 351, 355 (1980) (en banc). The twenty-two and a half month total delay must therefore be justified by the government whose burden in such a prima facie case is to "convincingly outweigh" appellant's assertions. *Day v. United States,* D.C.App., 390 A.2d 957, 970 (1978).

We note, however, that while the longer the delay, the heavier the government's burden, "the delay that can be tolerated for a serious and complex charge . . . is considerably more than for a simple misdemeanor." *Rink v. United States,* D.C.App., 388 A.2d 52, 58 n. 11 (1978). It cannot be gainsaid that this case has involved complex problems of prosecution, serious multiple charges—initially against two defendants, difficult evidentiary issues and important pretrial questions regarding the fairness of the impending trial. The twenty-two and a half month pretrial delay in this case therefore is not beyond explanation. We have previously upheld a significantly longer delay in *Day v. United States, supra* (thirty-two and a half months).

The second part of the *Barker v. Wingo* analysis requires us to examine the specific reasons for the delay and, where appropriate, assign respective portions of the delay to the responsible party. Protractions due to court congestion and judicial deliberation are ultimately the responsibility of the government, *Barker v. Wingo, supra,* 407 U.S. at 531, 92 S.Ct. at 2192, but they are considered more "neutral" factors and are "weighted less heavily against the government." *Id.*

The initial five-month pretrial delay and approximately five and a half months of the post-remand delay are attributable to institutional delays, including four transfers of the case resulting in the participation by five different judges in various stages of the proceedings. The equivalent of two months of postponements during the post-remand period was directly occasioned by the court's unavailability and rescheduling. The rest of the ten and a half month delay is attributable to scheduling requirements which take into account the time needed by the court and parties to prepare for a case so complex, as well as the generally overcrowded dockets of the Superior Court. Appellant does not charge the government with any deliberate delays for the sake of gaining an advantage over him which would be "the result of such negligence or callous indifference to the requirement of speedy trial. . . ." *Hedgepeth v. United States,* 124 U.S.App.D.C. 291, 295, 364 F.2d 684, 688 (1966). Therefore the institutional delay must indeed be assessed as a neutral factor against the government.

The twelve month balance of the total pretrial delay was mainly caused by the filing, hearing and resolution of pretrial motions during the post-remand period, chief of which was the government's motion to introduce the prior testimony of "unavailable" complaining witnesses. The questions of law and fact involved in that motion exceeded the others by far in novelty and difficulty. However, it would not be fair to attribute this delay exclusively to the government because four of the motions were made on behalf of appellant and themselves required significant judicial consideration.

Appellant was directly responsible for some of the pretrial motion delay. It took him almost three months after the first status hearing following our remand to file

*e. g., Branch v. United States,* D.C.App., 372 A.2d 998 (1977).

**29.** Although both sides cite September 10, 1973 as the date that appellant's first trial commenced, the docket entries indicate it was only

a status hearing that was held on that date, followed by various pretrial motions which were disposed of on September 19 and 20. The jury was not sworn in till September 21.

his motions. Appellant requested a two week extension of time to file his pretrial motions, explaining that they "involve[d] rather convoluted issues of law and fact, stemming from the unusual posture of this case in the criminal justice system" and that the vacation schedules of his counsel and the attorney for the United States conflicted. The two week extension, granted by the motions judge, was caused by appellant's request and should correspondingly reduce the delay attributable to the government. The rest of the three month period before the filing of the motions did not actually "delay" the proceedings, but is the type of "neutral" factor which should be weighted less heavily against the government.

Nor should the remaining eight and a half month "pretrial motions delay" count as a significant charge against the government. It is noteworthy that the question regarding the admissibility of the complaining witnesses' prior trial testimony was originally raised by appellant as a motion to exclude the testimony and was subsequently recast as a government motion. Moreover, the prosecutor cannot really be faulted for the complexity of the issues involved in his motion, nor for the time consumed by the court in appointing a second psychiatric expert to examine the witnesses and testify as to their unavailability. This procedure alone took up almost five months of the delay, partly occasioned by the expert witness' scheduling problems, partly by those of the court. After the second psychiatrist presented her testimony, the court took another month and a half to rule in a thirty-nine page order on the government's motion as well as on appellant's four motions.

We therefore conclude that the eleven and a half month delay caused by the filing and disposition of pretrial motions is not a significant charge against the government, and, along with the ten and a half month period of institutional delay, should be considered a more neutral factor in evaluating

appellant's claim. Nonetheless, neutral charges must still be counted against the government "since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Barker v. Wingo, supra,* 407 U.S. at 531, 92 S.Ct. at 2192.

Under part three of the *Barker v. Wingo* test, we are to examine appellant's assertions of his right to a speedy trial. Appellant here timely pressed this right through motions filed on November 2, 1977[30] and July 28, 1978, respectively. His representations to the court clearly expressed his willingness and desire to proceed to trial expeditiously, and are "entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Id.* at 531–32, 92 S.Ct. at 2192–93. But appellant's sense of injury may have been exaggerated at the time he presented his speedy trial motions since the arguments in his supporting memorandum were to a great extent based on the approximately three year, five month delay caused by the appeal of the *Davis* trial. That appellate delay is not included in the instant speedy trial claim in view of our ruling in *United States v. Alston, supra,* at 356, that "the Sixth Amendment does not apply to post-conviction appellate delay." Nonetheless, appellant's timely assertions of his right do support his present claim on appeal.

The prejudice factor is the final element of speedy trial analysis. Appellant need not affirmatively demonstrate that he has been prejudiced in order to prevail on speedy trial grounds. *Moore v. Arizona,* 414 U.S. 25, 26, 94 S.Ct. 188, 189, 38 L.Ed.2d 183 (1973); *United States v. Bolden,* D.C. App., 381 A.2d 624, 628 (1977). Appellant does however affirmatively claim that he was prejudiced by the delay in that it caused him increased anxiety. The minimization of anxiety and concern is indeed one of the interests protected by the right to a speedy trial. Appellant claims that although he was convicted in Maryland in

---

**30.** Although both the government's brief and appellant's brief state that appellant first asserted his speedy trial right in September of

1977, the first motion for a speedy trial bears a filing date of November 2, 1977.

1975 for the rape of Debra Waters and sentenced to life imprisonment,[31] he was caused anxiety by the fact that he did not know whether he would get credit for time served in District of Columbia institutions while awaiting trial. This, however, is not the type of anxiety which rises to the level of actual prejudice.

The Maryland sentence precludes appellant from contending that his interest in avoiding pretrial incarceration could have been protected had the trial date been moved up. Nor does appellant allege that the delay specifically affected the third and most important interest protected by the speedy trial right, the interest in limiting impairment of the accused's defense. Thus we can fairly conclude that appellant suffered no special prejudice from the delay.

■ The balancing process which we are required to undertake to reach our decision on appellant's speedy trial claim is an especially difficult and sensitive one because we cannot completely ignore the fact that even though the relevant pretrial delay was twenty-two and a half months, an additional forty-one months were spent in the appellate forum before appellant was retried. We nevertheless conclude that the government has successfully carried its burden of refuting appellant's prima facie claim. The pretrial delay chargeable to the government in this case was of a neutral sort and is explainable, if not fully justified, in terms of institutional overload as well as by the very complex issues of fact and procedure involved in the case. Moreover, appellant has failed to allege any prejudice to his defense and indeed, since he presented no evidence of his own at retrial, he cannot contend that he suffered as a result of fading memories or lost witnesses. In fact, the delay may have actually weakened the prosecution's case, even though it was allowed to use transcripts of prior testimony by unavailable witnesses. *See Barker v. Wingo, supra,* 407 U.S. at 521, 92 S.Ct. at 2187 (delay works to an accused's advantage where government witnesses unavailable or their memories fade and the government is unable to carry its burden of proof).

### IV

Appellant's next two assignments of error can be evaluated under the same framework of analysis for they both concern improperly admitted prior consistent hearsay statements. The first category of challenged testimony consists of statements given by the complaining witnesses at a September 1973, pretrial suppression hearing held before the *Davis* trial. The second category of objectionable testimony encompasses extra-judicial conversations between police investigators and the complaining witnesses. The suppression hearing testimony was introduced at the retrial, directly following the dramatization of the prior trial testimony of each complainant, and was presented in the same manner, by reenactment. Thereafter, the government called various police officers to testify about their interviews with the complaining witnesses.

■ Prior statements consistent with a witness' trial testimony are inadmissible on the theory that " 'mere repetition does not imply veracity,' and that once an inconsistency in statement is shown, evidence of additional consistent statements does not remove the inconsistencies." *Scott v. United States,* D.C.App., 412 A.2d 364, 373 (1980); *Rease v. United States,* D.C.App., 403 A.2d 322, 327 (1979); *Coltrane v. United States,* 135 U.S.App.D.C. 295, 418 F.2d 1131 (1969). *Scott v. United States, supra* at 372–73, recognizes two exceptions to this rule:[32] (1) admissibility of hearsay statement as spontaneous utterance;[33] (2) admissibility of hearsay statement, in "excep-

---

**31.** As noted *supra* note 3, appellant is also serving a life sentence in Maryland for murder.

**32.** *Compare* Fed.R.Evid. 806 which provides that the credibility of a hearsay declarant, if attacked, may be supported by any evidence

which would be admissible had the declarant testified as a witness.

**33.** This "exception" applies not only to this type of hearsay, but supports admissibility of other types of hearsay as well.

tional situations," to rehabilitate where (a) there is a charge of recent fabrication, or (b) "the witness' testimony has been impeached by a portion of a statement which also contains relevant information that could be used to meet the force of the impeachment." Quoting *Rease v. United States, supra* at 328 n.7.[34] A third exception may be added to this list for prior "description" testimony. Those portions of the police testimony and the suppression hearing testimony consisting solely of descriptions or identifications of the complaining witness' assailants are admissible as substantive evidence under the hearsay exception for prior description testimony recognized in *Morris v. United States*, D.C. App., 398 A.2d 333 (1978). Appellant has conceded this point.

Appellant has also refrained from objecting to the testimony of the first persons encountered by Sharon Williams and Debra Waters after being attacked, including the testimony of Officer Robert Kopec who was Williams' first contact with the police, near the scene of the crime. This testimony is admissible under the "complaint of rape" theory; not for the truth of the matter asserted, but merely for the fact that the statement was made. *Fitzgerald v. United States*, D.C.App., 412 A.2d 1, 9 (1980).[35]

■ Aside from the "complaints of rape" and prior description testimony, much

of the suppression hearing testimony as well as much of the police officer's testimony, related the rape victims' detailed reports of the crimes.[36] Regarding the suppression hearing testimony, it is the government's position that it was proper to introduce not only those portions which consist of statements of prior description,[37] but also the rest of the pretrial hearing testimony, except for those segments introduced at the first trial.[38] We disagree with this contention and hold that only the statements of prior description from the suppression hearing testimony were admissible. *See Morris v. United States, supra*.

The government seeks to justify introduction of the pretrial testimony under the *rehabilitation* exception recognized in *Scott v. United States, supra*, and its precedents. We disagree that use of those excerpts in which the complainants relate the circumstances of the crimes constituted legitimate rehabilitation, to the extent it was rehabilitation at all. It is significant that the suppression hearing testimony was introduced at appellant's retrial, in effect as part of the government's case in chief, not as rebuttal. No evidence was put on by the defense during this second proceeding. Moreover, at the opening of the retrial, appellant's counsel announced his intention to refrain from presenting additional evidence on behalf of appellant.[39] Thus there was no impeachment of government wit-

---

34. Statements corroborating a sexual assault were proposed as another exception to the general inadmissibility of prior consistent statements in *Scott v. United States, supra* at 372. This theory was rejected by our court because "nothing in [the corroboration requirement cases] waives the rules of evidence as to corroborating evidence."

35. In this case, initial complaints, having been made immediately following the rapes, may also be admissible as "spontaneous utterances" and received as substantive evidence. *See Fitzgerald v. United States, supra* at 8–9 (promptness of report and circumstances precluding fabrication support spontaneous utterance exception). No limiting instruction was given by the trial judge respecting the manner in which testimony of these first contacts was to be received.

36. Three detectives testified with respect to Sharon Williams' report of her attack; one

detective testified with respect to Debra Waters' report; and two detectives who had interviewed Marilyn Reed took the stand and, in turn, related her report.

37. This would include about two pages of Debra Waters' pretrial testimony and six and a half pages of Marilyn Reed's pretrial testimony.

38. *See infra* note 42.

39. Appellant's counsel at the retrial stated: "It is our position now that if [the government] is only seeking to go to these other sources of cross-examination and testimony in order to rebut whatever additional material we may present, we are willing to present no additional material. We are willing to live with the cross-examination and testimony of [appellant's counsel] that was done at the first trial . . . ."

nesses beyond that which occurred at the first trial. In noting these matters, we are not saying that appellant's passive strategy at the retrial should penalize the government. However, we conclude that under the circumstances of this case, rehabilitation of witnesses impeached at the first trial should have been confined to that proceeding. The government had the opportunity to rehabilitate its witnesses at the first trial, and used it, twice by means of excerpts from the pretrial hearing. Its use of additional testimony from that hearing was more in the nature of repetition than rehabilitation. But even if we assume that the complainants were impeached at the first trial, to give the government a second chance to rehabilitate their testimonies in the context of this case runs counter to the policy expressed in *Coltrane v. United States, supra* at 304, 418 F.2d at 1140, and reiterated in *Rease v. United States, supra* at 327, that prior consistent statements, even for rehabilitation purposes should only be admissible in those "exceptional situations where . . . they could be of clear help to the factfinder in determining whether the witness is truthful." It is not at all evident that in the instant case, allowance of prior consistent statements served such a function. Moreover the government's need to twice "rehabilitate" the same testimony is not compelling, especially when appellant has refrained from further developing any inconsistencies in the complainants' testimony, and does not present the type of exceptional situation warranting the risk that for the jury, mere repetition will imply veracity. As stated in *Rease v. United States, supra* at 328, a prior consistent statement "may not be used in an attempt to support a witness' credibility generally by showing that his unimpeached testimony at trial is consistent with his earlier statements." Thus it was error to allow the sort of overbroad "rehabilitation" which the government undertook in reading to the jury the full pretrial hearing testimony relating to appellant's offenses.

 Nor can the pretrial suppression hearing testimony be rendered admissible under the prior recorded statement exception for otherwise inadmissible hearsay. This was the theory relied upon by the government at trial, and upon which the trial judge based his decision, in accordance with *United States v. Curry,* 471 F.2d 419 (5th Cir.), *cert. denied sub nom. Ciraolo v. United States,* 411 U.S. 967, 93 S.Ct. 2150, 36 L.Ed.2d 688 (1973).[40] As discussed *ante,* the requirements for admissibility of prior recorded testimony are: (1) unavailability of the declarant, (2) former testimony under oath, (3) substantially same issue(s) at the two proceedings, and (4) opportunity to cross-examine declarant at former proceeding. *See Henson v. United States, supra* at 19. In our judgment, this hearsay exception is inapplicable to the complainant's pretrial testimony because the unavailability requirement is not satisfied.

The requirement of unavailability embodied in the *Henson* standard is one of constitutional dimensions and is based upon the principle of necessity: "in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. . . . [T]he prosecution must either produce or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant." *Ohio v. Roberts, supra* 448 U.S. at 65, 100 S.Ct. at 2538 (citations omitted). However it is more accurate to say that it is the unavailability of the declarant's testimony rather than unavailability of the declarant himself, that, by necessity, renders his former sworn testimony admissible. *See supra* note 10. Thus, just as "the witness may be physically present in court but his testimony nevertheless unavailable,"[41] the declarant may be physically absent from court, yet his testimony never-

---

**40.** *United States v. Curry, supra,* held admissible at trial (not retrial), the suppression hearing testimony of an unavailable witness, as well as his later in-court statement that his testimony was limited because he was intimidated by a government agent.

**41.** McCormick, *supra* at 608. A declarant may be unavailable if he refuses to testify or asserts a privilege or his memory fails. *Id.* at 611–12.

theless available. Such is the situation in the instant case. The complainant's full testimony on direct and cross-examination from the first trial was available at the retrial and was fully presented to the jury. Moreover, nothing in the testimony at the pretrial hearing exceeded in scope the matters or issues discussed during the subsequent examination at trial. We can distinguish the case of *United States v. Curry, supra*, relied on by the trial court because there, one of the witnesses' statements substantially differed from the other and represented otherwise truly unavailable testimony on a matter not covered at the prior hearing, namely, the effect of a threat by a government agent on the witness' testimony at the prior hearing. The pretrial hearing transcripts in this case offer no such new or different evidence. Any variations between the two sets of testimony are attributable to differences in the manner in which the complainants responded to essentially the same questions at separate court appearances. Therefore, the availability of the first trial transcript in effect rendered the declarants "available" and made the pretrial suppression hearing transcript unnecessary for purposes of proving the government's case against appellant.

The government has admitted that at least one portion of the suppression hearing testimony,[42] as well as all of the police officers' testimony (other than the prior description testimony), was erroneously introduced. However, the government contends these errors were harmless "in light of the three unequivocal identifications and the common *modus operandi* employed in all three offenses," which would have resulted in a guilty verdict. We leave the question of harmless error for later resolu-

tion in view of the presence of other errors committed at appellant's trial, including those not recognized by the government with regard to this issue and others yet to be discussed. "Where there are numerous errors in a trial, the reviewing courts must weigh the cumulative impact." *United States v. Freeman*, 169 U.S.App.D.C. 73, 77, 514 F.2d 1314, 1318 (1975), *vacated on other grounds*, 194 U.S.App.D.C. 387, 598 F.2d 306 (1979). We note however that here, as in *Tibbs v. United States*, D.C.App., 359 A.2d 13, 16 (1976), where we reversed a conviction on the grounds that a witness' prior consistent statement to a police officer was brought in through the police officer's testimony, the hearsay statements "resulted in adding the weight of the police officer's status to the complainant's testimony." In addition, the complainants' own testimony from the suppression hearing reinforced their credibility and bolstered their trial "testimony." The erroneously introduced testimony namely, all of the police officers' testimony about the complainants' reports, and all of the pretrial suppression hearing testimony, aside from statements of prior description, formed a substantial part of the government's case at trial. Even without considering other errors, it is difficult to see how these could be deemed harmless.

## V

Appellant additionally asserts, as grounds for reversal of his convictions, that the trial court erroneously permitted the jury to hear statements made by him to a probation officer. The statements were contained in a presentence report prepared after the first trial and essentially read to the jury by the probation officer, Leroy Swepson.[43]

---

**42.** At the first trial, Debra Waters was impeached on cross-examination with regard to her ability to see the appellant. On redirect, the prosecutor rehabilitated her testimony by using portions of her suppression hearing testimony. At the retrial the jury was read the entire proceedings from the first trial, including the rehabilitating quotations from the suppression hearing, and immediately thereafter, was again read Waters' suppression hearing testimony. In his reply brief, appellant notes that

the same impropriety occurred when a significant portion of Sharon Williams' suppression hearing testimony was read twice to the jury during appellant's retrial, first as part of the original trial transcript, and then independently, together with additional consistent testimony.

**43.** The probation officer's testimony reads as follows:

Superior Ct.Cr.R. 32(b)(1) states in relevant part, that a presentence report "shall not be submitted to the court or its contents disclosed to anyone unless the defendant has pleaded guilty, or *nolo contendere*, or has been found guilty . . . ." Our reversal of appellant's convictions from the first trial effectively meant that he had not yet been found guilty at the time Officer Swepson gave his testimony before the jury at the second trial. Resort to the presentence report was therefore impermissible under Rule 32(b)(1), a restriction which evidently was not considered by the trial court.[44]

Q. Okay. Would you read from Government's Exhibit No. 51, first of all, whatever Mr. Warren said with respect to the case of Marilyn Reed?

A. In the case of Marilyn Reed, the defendant gave me this version, his version of the offense, and it went this way. The defendant alleged that he knows Miss Reed from Federal City College. He further alleged that he knew where the complainant worked, and was at the proper location to pick her up on the evening of the offense.

According to the defendant, Miss Reed asked him for a ride home. He also alleged that on the way home he asked her to have sex with him, to which she agreed. They stopped in an alley and she had a sex relation with the defendant. She also agreed and had sex relations with the co-defendant, John Davis, voluntarily.

She charged John Davis with taking it, but did not do anything about it at the time. Later, both were arrested. The defendant denied force by either. The defendant alleged that he denied he knew Miss Reed when he was questioned in the Sex Squad Room and during the trial because of John Davis' wife, meaning this was for the co-defendant's best interest.

Mr. Warren also alleged he believed that the complainant would not have brought any action if John Davis had not gone back for more two or three days later.

Q. Now, with respect to Sharon Elizabeth Williams, did Mr. Warren tell you what his version of the events were with respect to that lady?

A. He gave his version in the case of Sharon Elizabeth Williams.

Q. Would you tell us what that version was?

A. The defendant alleged that he and Paul Fletcher and Paul Brooks picked the complainant up at 13th and U Street, Northwest. The defendant further alleged that he had known Miss Williams in the past and knew she was on dope and a junkie. They rode around the Cardoza area and Miss Williams asked for some smoke. The defendant said he had some and gave it to her. According to the defendant, Miss Williams wanted some cocaine, so they proceeded to find a friend who might have some.

They went to an apartment building in Kenilworth Terrace, an apartment housing area. The friend was not home and they parked in the area. According to the defendant, Miss Williams was high on beer and smoke. He admitted he asked for sex and she agreed. He alleged they went inside an empty building. The defendant admitted he had sex with Miss Williams whom he said agreed.

After this, the two other males in the group had sex with Miss Williams. While she was dressing, all left. The defendant admitted that Miss Williams was very high on beer and marijuana, and they could not get any sense into her, so they left her there because they did not want to get stuck with her for the night.

44. Appellant moved pretrial to suppress the inculpatory statements in the pretrial report on the grounds that (1) he was given no *Miranda* warnings, (2) he did not knowingly waive his rights, and (3) exclusion should be ordered in the exercise of the court's "supervisory powers" to guarantee fairness and an unimpeded sentencing process. The trial court held that *Miranda* did not apply and the statements were not involuntary. As to the exercise of supervisory power, the court recognized that

In the District of Columbia, there are policy expressions against the admissibility of statements under circumstances which bear some similarity to those here involved. Thus, the Bail Agency Act (D.C.Code 1973, § 23–1301 et seq.) provides that information secured by that agency may not be divulged except for bail-setting and other limited purposes but not for use as evidence during the prosecution's case in chief at a trial. Similarly, Superior Court Juvenile Rule 111 directs that "unless advised by counsel, the statement of a child made to . . . a probation officer . . . shall not be used against the child. . . ." Also, both in the federal courts and elsewhere, statements made to a government psychiatrist are inadmissible, as are statements made to a jail employee for routine classification purposes. *Killough v. United States*, 119 U.S.App.D.C. 10, 336 F.2d 929 (1964). [Footnotes omitted.]

It ultimately directed the parties to other, policy-making bodies, noting that

It is presumably because questions such as these usually involve jurisdiction-wide or court-wide policies that the fashioning of exclusionary rules on a policy basis has generally been exercised legislatively (as in the Bail Agency Act); by the highest court of a State (as in the California decisions [*e. g.*, *People v. Hicks*, 4 Cal.3d 757, 94 Cal.Rptr.

Rule 32(b)(1)'s federal counterpart has been interpreted in *Gregg v. United States*, 394 U.S. 489, 89 S.Ct. 1134, 22 L.Ed.2d 442 (1969).[45] In *Gregg*, the petitioner argued that his conviction for jeopardizing the lives of postal employees while robbing them should be reversed because the trial judge read the presentence report before the jury returned its verdict, in violation of Fed.R. Crim.P. 32. The Supreme Court affirmed Gregg's conviction on the ground there was no direct evidence in the record that indicated the trial judge had read the report before the jury returned its verdict.[46] The Supreme Court, however, indicated strongly the interpretation to be given to Rule 32:

> Rule 32 is explicit. It asserts that the "report shall not be submitted to the court ... unless the defendant has pleaded guilty or has been found guilty." The language clearly permits the preparation of a presentence report before guilty plea or conviction but it is equally clear that the report must not, under any circumstances, be "submitted to the court" before the defendant pleads guilty or is convicted. Submission of the report to the court before that point constitutes error of the clearest kind. [*Gregg v. United States, supra*, 394 U.S. at 491–92, 89 S.Ct. at 1136; footnote omitted.]

In appellant's case, "error of the clearest kind" has been committed. Statements by appellant in the presentence report were not only heard by the trial judge, but also

by the jury. The fact that the report was prepared after the jury's verdict in the first trial is of no import, since that verdict was nullified as to appellant. The report contained information elicited from the appellant concerning the same case for which he was later separately retried.[47] The very nature of a presentence report is directly in conflict with the adversary nature of a trial. Information, quite often prejudicial, is obtained and used in making discretionary decisions about sentencing. The reports are informal documents. Information in them can be based on hearsay or pertain to separate matters having no relation to the crime with which defendant has been charged. Counsel is not present during the interview upon which the report is based.[48] It would be the essence of unfairness to use such information as evidence against the appellant.

The purpose of the sentencing report is to aid in the sentencing process. "The primary objective of the presentence report is to focus light on the character and personality of the defendant and to discover those factors that underlie commission of the offense and defendant's conduct in general." Note, *Presentence Reports*, 58 Geo.L.J. 451, 455–56 (1970). This information is essential in making a discretionary decision of sentencing. Allowance of this information as evidence of defendant's guilt would have a chilling effect on the interview.

---

393, 484 P.2d 65 (1971)] on presentence statements to probation officers); or by a court acting in its rule-making capacity (as in Superior Court Juvenile Rule 111). Similar considerations apply to the question of the exclusion of non-coerced, voluntary statements to probation officers.

**45.** Where the Superior Court Rule is "substantially the same as its federal counterpart" as here, this court has construed it "consistently with the federal rule." *Waldron v. United States*, D.C.App., 370 A.2d 1372, 1373 (1977); *see also Campbell v. United States*, D.C.App., 295 A.2d 498, 501 (1972).

**46.** The Court additionally held there was no prejudice to petitioner's rights since even if the judge had read the report after the jury retired it could not have affected the verdict.

**47.** It was because of the pretrial ruling that these statements would be admissible at trial that the trial judge instructed the jury at the outset that appellant had once before been convicted of the very crimes for which he was being retried.

**48.** Though we note that counsel was not present when appellant was interviewed by Officer Swepson, we do not reach the argument that presentation of the presentence report violated appellant's Sixth Amendment right to counsel. *See Hall v. United States*, 47 Md.App. 590, 425 A.2d 227 (1981) (rebuttal testimony by probation officer impeaching defendant's trial testimony was not a violation of defendant's Sixth Amendment right to counsel, although no counsel was present at defendant's interview with probation officer).

The evidentiary error committed with respect to allowance of Probation Officer Swepson's testimony must be characterized as highly prejudicial since the sole defense at trial was the unreliability of the complainant's identifications and, implicitly, the lack of connection between appellant and the crimes. The probation report testimony directly conflicted with this theory since it contained admissions by the defendant directly implicating him in two of the offenses. Swepson's testimony effectively removed the issue of identification from the case and left appellant with no credible theory of defense, unless the jury could be convinced that appellant's statements to the probation officer were fabricated in hopes of a lenient sentence. This latter theory was unsuccessfully argued to the jury by defense counsel in closing.

## VI

The appellant's final claim of error is one of prosecutorial misconduct during closing argument. He convincingly argues that the prosecutor (1) improperly impugned the motives and integrity of defense counsel by distorting counsel's closing argument; (2) made several references to results of the first trial, inviting the jury to misuse evidence of the previous guilty verdict; (3) improperly expressed his own opinion of the veracity of the witnesses; (4) improperly commented on the appellant's silence at the time of his arrest. Despite the prima facie merit of these allegations of error, we do not rule on the issue of prosecutorial misconduct during closing argument, because the evidentiary errors which we have recognized in sections IV and V of our discussion are sufficient in themselves to warrant reversal of appellant's convictions. We thus limit our review to evidentiary matters likely to arise again should appellant be tried a third time for the offenses herein discussed. In view of the fact that the government has itself admitted to several instances of improper argument to the jury, we trust that those improprieties will be avoided if appellant is prosecuted anew.

## VII

The standard for reversal where more than one error is recognized on appeal is whether the cumulative impact of the errors substantially influenced the jury's verdict. *Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946); *United States v. Freeman, supra* at 77, 514 F.2d at 1318. The evidentiary improprieties which we have noted are: (1) reading of the complainants' pretrial suppression hearing testimony (other than prior description testimony); (2) police testimony relating the complainants' reports (other than prior description testimony, complaints of rape or spontaneous utterances); and (3) reading from appellant's presentence report by the probation officer.

The inadmissible hearsay evidence presented in this fashion constituted a significant part of the government's case, in both importance and quantity of testimony. The repetitious narrations of the complainants' reports and their pretrial testimony artificially strengthened the complainants' identifications and had the additional effect of impressing upon the jury the sordid nature of the crimes. Lest the jury have any doubt about appellant's involvement, the probation officer's testimony would have effectively removed it. It is an understatement to say that admission of such improper testimony and allowance of the transcript readings substantially swayed the jury's verdict. The errors committed no less than compelled a finding of guilt. At this retrial, the outcome of which depended entirely on the identifications made by absent witnesses, the jury, instead of assuming their function as arbiters of fact, were a captive audience to a dramatic reenactment of the prior trial. Because none of the complaining witnesses testified in person against appellant, their credibility could not be directly assessed by the jury. Instead, they had to rely exclusively on the hearsay evidence presented through a litany of repetitious readings and officially-imbued police and probation officer testimony. We must conclude that the errors we have not-

ed substantially influenced the jury's verdict.

*Reversed.*

KERN, Associate Judge, concurring:

I agree that the judgment of conviction must be reserved because the trial court erred by allowing the government to present to the jury in its case-in-chief at this retrial of the rape charges some of the contents of the presentence report prepared after the first trial resulted in a guilty verdict. In this material, appellant incriminated himself by admitting to his probation officer that he had had sexual relations with two of the complainants. Such ruling [1] violated the terms of Super.Ct.Cr.R. 32(b)(1),[2] and the mandate of the Supreme Court in *Gregg v. United States*, 394 U.S. 489, 89 S.Ct. 1134, 22 L.Ed.2d 442 (1969).[3]

Since appellant did not testify and his counsel argued to the jury at the second trial that the government had failed to prove that appellant, rather than another, was the perpetrator of the rapes in question, the impact of the court's erroneous admission into evidence as a part of the prosecution case of this highly-incriminating material from the report was significant.[4] Accordingly, I am not persuaded the error was harmless under the *Kotteakos* test.[5] Regretfully, the case must be tried again because the error was substantial.[6]

1. The judge who rendered this ruling on a pretrial motion to exclude by appellant did not preside over the retrial.

2. This Rule provides in pertinent part:
 The report shall not be submitted to the court or its contents disclosed to anyone unless the defendant had ... been found guilty....

3. The Court stated in relevant part (at 492, 89 S.Ct. at 1136–37):
 To permit the *ex parte* introduction of this sort of material [the contents of the presentence report] to the judge *who will pronounce the defendant's guilt or innocence* ... would seriously contravene the rule's purpose of preventing possible prejudice from premature submission of the presentence report. No trial judge, therefore, should examine the report while the jury is deliberating since he may be called upon to give further instructions or answer inquiries from the jury, in which event there would be

the possibility of prejudice which Rule 32 intended to avoid. [Emphasis added.]

4. Had the prosecution withheld the contents of the presentence report from its case-in-chief and used this material only to impeach appellant, should he have taken the stand, then its admission would seem proper. *Hall v. State*, 47 Md.App. 590, 597, n.4, 425 A.2d 227, 231–32 n.4 (1981), citing *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), and *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

5. *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

6. I agree with the majority's treatment of the various other contentions by appellant on appeal, except that I find the trial court's admission of the hearsay evidence to have been harmless error under the circumstances.