**STATE of Iowa, Appellee,**

v.

**Kenneth Charles HARDY, Appellant.**

**No. 90–1590.**

Court of Appeals of Iowa.

Aug. 27, 1992.

---

Alfredo Parrish of Parrish & Kruidenier, Des Moines, for appellant.

Bonnie J. Campbell, Atty. Gen., Roxann M. Ryan, Deputy Atty. Gen., Thomas J. Ferguson, County Atty., and Thomas Bower, Asst. County Atty., for appellee.

Heard by OXBERGER, C.J., and HAYDEN and HABHAB, JJ., but decided en banc.

DONIELSON, Judge.

The defendant, Kenneth Hardy, met Rochelle Barry in Shagnasty's Bar in Cedar Falls, Iowa, on the evening of August 18, 1989. When the bar closed at 2 a.m., Barry and her friend, Sara Tomson, accompanied Hardy to an isolated sand pits area in Waterloo, Iowa. When Tomson told Barry she was ready to go home, Barry and Hardy ignored her and entered a wooded area behind Tomson's car. After waiting for close to an hour for the two to return, Tomson began looking for them. A man stopped to assist Tomson in her search, but neither was successful. A police officer then joined in the search, and Barry's clothing was discovered strewn about an area of the woods where the grass and weeds had been matted down. The police were able to follow shoeprint impressions and footprints for some distance around the area of the sand pits, but they were unable to locate either Hardy or Barry. Tomson gave the police Hardy's name, and a police officer went to Hardy's house to look for him. When the officer knocked on the door to Hardy's house at 7:30 a.m., no one answered. However, at about 9:15 a.m., the officer returned to find the door was open, and Hardy came outside to greet the officer.

Hardy then voluntarily accompanied the officer to the police station, where he signed a written waiver of his *Miranda* rights and gave a statement. After taking Hardy's statement, the officers noticed some scratches on his body. They seized his shoes and shirt and ordered him to remove his shorts so the scratches could be photographed. The seizure and photographs were made prior to securing a lawful search warrant.

A full scale search was conducted for several days, but Barry was not discovered until September 2, 1989, when two men

who had been driving through the sand pits happened upon her partially buried corpse. The corpse had decomposed beyond visual recognition and had to be identified using Barry's dental records. The autopsy showed Barry died from asphyxiation, having been suffocated after sustaining trauma and knife wounds to several areas of her body. The state medical examiner testified the entrance to Barry's vagina had some circumferential abrasions. Yet later he testified the surface tissue at the entrance of the vagina was gone, having decomposed at a faster rate than had the majority of the rest of the body. The autopsy photos show the vaginal area was infested with maggots and badly decomposed. The increased rate of decomposition had been caused, according to the medical examiner's testimony, by premortum trauma to the tissue resulting in bruises which, in turn, caused an increase in the rate of decomposition. In any event, the medical examiner testified he believed the condition of the vaginal area was produced by forcible sexual penetration, but no seminal fluid was found in the vagina. There was absolutely no evidence of trauma to her anus. The medical examiner could not say Barry had engaged in anal intercourse.

On August 19, 1989, between 10:30 a.m. and 11:30 a.m., Investigator Lake seized a shirt, which had allegedly been worn by Hardy the night Barry disappeared, from Melissa Watson at her place of work. Investigator Nemmers admitted the only source of information suggesting Watson possessed the shirt was a note Watson had written and the investigators had seen in Hardy's home. However, a warrant to search Hardy's home was not secured until after the shirt had been taken from Watson, making it abundantly clear the investigators had entered Hardy's home without a warrant.

Hardy was charged with first-degree murder. In the pretrial proceedings, Hardy filed numerous motions in limine and evidentiary suppression motions together with other sundry motions for recusal, continuance, and to split closing argument. He also filed an application with the Iowa Supreme Court for an interlocutory appeal.

The appeal and the bulk of the motions were denied.

Hardy's evidentiary suppression motions requested his shirt, his shoes, and the photographs taken of him at the police station all be excluded from evidence because his fourth amendment rights had been infringed by various warrantless searches conducted by the police. This motion was denied.

Trial commenced on September 11, 1990. At trial the jurors were allowed to examine several items of information which possessed a particularly high potential to encourage them to make their findings on an improper basis. First, a reference to Hardy's prior assault convictions, having been held inadmissible by the trial court due to its "particularly unfair prejudicial effect," was inadvertently published to the jury. A curative instruction was later given.

Second, the State presented testimony from four of Hardy's prior sexual partners to show he had engaged in forceful anal, oral, and vaginal sex with his girlfriends in the past. Teresa Marvin testified the defendant forced her to have anal sex once when they were dating. Shantell Woodard, another girlfriend, testified the defendant had done the same to her. Kim Rath testified that while she was dating the defendant, he forced her to have anal, oral, and vaginal sexual intercourse on occasion. Jennifer Hoth testified that after they had been dating, she took the defendant home with her and he tied her up—quite possibly with restraints she had provided for that purpose—and he forced her to have anal and vaginal intercourse and assaulted her with a knife, leaving bruises and possibly a small cut. The trial court allowed the evidence for the limited purpose of showing the defendant's motive or intent under Iowa Rule of Evidence 404(b), which allows evidence of other crimes or bad acts for such purposes. Hardy argued the district court erred in concluding the testimony was relevant to prove motive or intent. He also argued the testimony's prejudicial effect outweighed its limited probative value.

In a related issue, the trial court severely limited Hardy's cross-examination of these witnesses, finding Iowa Rule of Evidence 412, the rape shield statute, prohibited evidence of the witnesses' past sexual history. Hardy unsuccessfully argued that, if the testimony of the four women was to be admitted at all, he should have been allowed to impeach the women with cross-examination about their sexual histories.

Third, the trial court admitted evidence offered by the State to show that, on the night before the murder, a local cable television station had carried a movie about the life and crimes of the notorious serial killer of women, Ted Bundy. Hardy argued the testimony concerning the timing and content of this movie, "The Deliberate Stranger," was highly prejudicial while wholly irrelevant and immaterial. The State successfully maintained this evidence was relevant because the victim's friend, Sara Tomson, testified Hardy told the two women "I'm no Ted Bundy" in an attempt to persuade the women he was not a threat to them.

On September 17, 1990, Hardy filed a petition for a writ of mandamus in the Iowa Supreme Court requesting the trial court be directed to allow Hardy to make offers of proof when appropriate and to allow defense counsel to approach the bench for conferences upon request. Justice Lavorato denied the writ after Judge Stigler agreed to allow Hardy to make an offer of proof.

The jury found Hardy guilty on the charge of first-degree murder, and Hardy was sentenced to a term of life in prison.

Hardy now appeals from his conviction asserting many arguments for reversal. First, he contends he is entitled to a new trial due to numerous instances of misconduct by the trial judge. Hardy asserts the trial judge demonstrated personal bias and animosity toward him on several occasions in and out of the presence of the jury. Hardy also complains the trial judge made two impermissible comments on the importance of certain items of evidence in the presence of the jury.

Hardy contends the district court should have suppressed evidence resulting from two allegedly illegal searches and seizures. He challenges the warrantless seizure of his shirt and shoes during a police interrogation, and he also challenges the warrantless photographing of his body during the same interrogation. In addition, he contends the police conducted an illegal warrantless search of his home before returning later with a warrant. The State denies any preliminary warrantless search of the home occurred.

Finally, Hardy argues the cumulative effect of the prejudice created by the testimony of his past girlfriends, the evidence of his prior assault convictions, and the evidence concerning the movie "The Deliberate Stranger" overwhelmingly outweighed any probative value the evidence may have had, and, therefore, it should have been excluded under Iowa Rule of Evidence 403. He contends the limiting or curative instructions were inadequate to have sufficiently dampened the prejudicial effect of this evidence.

■■■ On our review of the record, we are unable to say the defendant received a fair trial, and, therefore, we reverse and remand for a new trial. We base our decision on Hardy's last argument. We find the value of all three of these items of evidence, in tending to establish the identity of the victim's murderer in this case, was miniscule. On the other hand, the evidence was teeming with the tendency to suggest the defendant is an assaultive sexual deviant and rapist who has styled himself after the late mass murderer Ted Bundy, and is, therefore, likely to have committed the crime of murder with which he was charged. Certainly, at the very least, the information had the extreme potential of confusing the issues.

Iowa Rule of Evidence 404(b) provides: Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowl-

edge, identity, or absence of mistake or accident.

The purpose of the rule is to exclude from evidence a defendant's prior bad acts if they have no relevance other than to show the defendant is a bad person and, therefore, is likely to have committed the crime with which he is charged. *State v. Spargo*, 364 N.W.2d 203, 208 (Iowa 1985); *State v. Munz*, 355 N.W.2d 576, 581, (Iowa 1984); *State v. Cott*, 283 N.W.2d 324, 326 (Iowa 1979); *State v. Wright*, 191 N.W.2d 638, 641 (Iowa 1971). We are convinced the testimony offered by four of Hardy's past girlfriends had little if any probative value on the issue of Hardy's motive, intent or any other excepted purpose. We do not see why his having raped his girlfriends anally would give Hardy the motive to murder an entirely different woman, whom he had not anally raped, soon after meeting her for the first time. On the other hand, it was extremely prejudicial, having the tendency to inflame the jury. It surely painted the defendant as the type of bizarre animal who would be likely to have committed the crime. *See, e.g., United States v. Colombo*, 909 F.2d 711, 715 (2d Cir.1990) (evidence linking defendant to rape and sodomy brand him a reprehensible person).

Iowa Rule of Evidence 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury....

We believe the evidence, even if permissible under rule 404(b), should have been excluded under rule 403.

Evidence that appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action may cause a jury to base its decision on something other than the established propositions in the case.

*See* J. Weinstein & M. Berger, *Weinstein's Evidence*, 404[03] at 403–33–40.

The evidence of Hardy's prior assault convictions, which was inadvertently given to the jury after being ruled inadmissible, added to the already extreme level of prejudice. In light of the many sources of prejudice and the overall amount of prejudicial evidence admitted, we do not believe the trial court's curative instruction served to alleviate the unfair effects of the evidence of the prior assault convictions. Finally, the evidence concerning the content and timing of the movie about Ted Bundy served only to unfairly prejudice the defendant by drawing a not-so-subtle analogy between the defendant and a notorious serial killer.

If Iowa Rules of Evidence 404(b) and 403 are to be given any effect whatsoever, surely it should be to keep this type of information from jurors. *See State v. Plaster*, 424 N.W.2d 226, 229, 231 (Iowa 1988).

Were each of these assignments of error examined in isolation from the others, it might be possible to find the trial court's evidentiary rulings were not "clearly erroneous" or "unreasonable" and, therefore, did not constitute an abuse of discretion. It might be possible to say the attendant prejudice is insufficient to warrant reversal. However, the cumulative effect of this evidence is something entirely different.

Furthermore, while trial courts are ordinarily afforded broad discretion in ruling on evidentiary challenges and designing curative instructions, we believe such deference would be misplaced in this case. Given the level of hostility the trial judge exhibited towards the defendant in this case, we do not believe his discretionary rulings should be given the ordinary level of deference. Statements made by the trial judge, both in and out of the jury's presence, suggest the judge allowed his personal feelings and interests to create a palpable atmosphere of hostility during the trial.

During the direct examination of Melissa Watson, the trial judge said:

Because this is such a critical issue, I'd like you to have her put on the record when she said, "I gave him a scratch here." Where is here for the record.

Later, the judge instructed the jury to disregard his remark. The judge made another remark when defense counsel objected to certain testimony given by State's witness, Officer Rathbone, as being speculative. The judge overruled the objection stating: "Seems pretty much obvious that if clothing is found—." The witness testified the victim's shirt, jeans, shoes, and undergarments were found away from her nude body.

Jurors are particularly sensitive to the presiding judge's views and may be unduly influenced by what they perceive those views to be. *See State v. Cuevas,* 288 N.W.2d 525, 533 (Iowa 1980); *State v. Larmond,* 244 N.W.2d 233, 236 (Iowa 1976). We are mindful that "jurors hang tenaciously upon remarks made by the court during the progress of the trial, and if, per chance, they are enabled to discover the views of the court regarding the effect of a witness's testimony, or the merits of the case, they almost invariably follow them." *State v. Shearer,* 206 Iowa 397, 404, 220 N.W. 13, 16 (1928).

We are also directed to remarks made by the trial judge outside the presence of the jury. The tensions evident during the trial stemmed from the trial judge's reaction to the following colloquy with the defendant:

MR. HARDY: What about the comment I heard this morning. I heard you say?

THE COURT: What about did you hear me say? What I said this morning in a personal conversation with a lawyer was about my stepson in Arizona.

MR. HARDY: Mr. Hardy's name was in there too.

THE COURT: There was nothing.

MR. HARDY: Was hitched to the wrong horse. I heard you say that.

THE COURT: Get Kathie Bryant in here, would you please, Haverkamp's reporter? I was talking about my stepson who worked for one of the candidates for a governor in Arizona. His candidate lost. My statement was he hitched.

MR. HARDY: The names were Hardy and Parrish.

THE COURT: There was never mention of Hardy and Parrish.

MR. HARDY: That's not true.

The trial judge took great offense at the defendant's remark that the trial judge's memory of his earlier comments was incorrect. The trial judge became further incensed after the following remarks:

THE COURT: Is this acceptable to you, Mr. Parrish, that there was no conversation as alleged by Mr. Hardy or shall we bring Mr. Koury in?

MR. PARRISH: I'm sorry, what do you want me to do, Your Honor?

THE COURT: I wanted you to tell me whether Mr. Hardy's version of that conversation is correct.

MR. PARRISH: I don't want to alienate the Court any further on this. I don't know what you want me to do. You tell me.

THE COURT: I'm telling you, point blank, Mr. Hardy has just made a very serious accusation against me. He said I engaged in a conversation this morning, in full display of court reporters and others, that I said Mr. Hardy had hitched his cart to the wrong horse, in essence, that he had made a mistake in employing you. I have just told you, I made no such statements. Ms. Bryant has indicated I made no such statements.

THE DEFENDANT: You asked—

THE COURT: I want you to be quiet. Do you want Mr. Koury to be brought in?

MR. PARRISH: If I say yes, you may accuse me of being too zealous.

THE COURT: I want you to tell me whether you think Mr. Hardy's statements have any credibility at this point?

MR. PARRISH: Wait a minute, Your Honor—

THE COURT: Never mind. Bring in Mr.—ask Mr. Koury to—he's in the other courtroom right now I'm told. Let's bring him in. Let's see what his reaction is.

The trial judge became angry at defense counsel for not immediately accepting the trial judge's recollection of his remarks, and it is clear the judge remained quite

angry throughout the trial. He repeatedly made reference to his belief he had been called a liar by both the defendant and his attorney. During the hearing on the motion for new trial the following was said:

THE COURT: ... Mr. Parrish, I intend to ask you, in fact, I intend to demand from you an apology for your conduct in this matter....

MR. PARRISH: ... which specific conduct did you want me to apologize to, Your Honor?

THE COURT: I'm asking you in general for your overall conduct, most specifically for the adoption of the claim that I was a liar.

While we are not convinced the trial judge's statements alone deprived the defendant of a fair trial, we do believe the trial judge's conduct should be taken into consideration in examining his discretionary evidentiary rulings and in understanding the level of prejudice in the atmosphere in which the defendant was tried. If the trial judge proved incapable of preventing his hostilities toward the defendant from affecting his judgment, how can we believe the lay jurors could have done so in the face of the inflammatory evidence with which they were presented?

We do not believe the jurors in this case were as adept as a court at weighing the unfairly prejudicial aspects of each item of evidence in an isolated fashion and, thus, ignoring the cumulative and synergic effect. We believe Hardy's trial was injected with several doses of unfair prejudice which, on their own, may not have warranted a new trial, but when combined, denied Hardy a fair trial.

The costs of this appeal are taxed to the State.

For all the reasons stated, the defendant's conviction is reversed and the case is remanded for a new trial.

REVERSED AND REMANDED FOR NEW TRIAL.

All Judges concur, except HABHAB, J., who dissents.

HABHAB, Judge (dissenting).

I respectfully dissent. I would affirm the defendant's conviction of first-degree murder. I concede, for the most part, the district court committed the errors addressed in the majority opinion. However, I find these errors were harmless and did not prejudice the defendant. I find there is overwhelming evidence the defendant is guilty of first-degree murder, and I am unable to conclude the defendant did not receive a fair trial.

I find the State proved beyond a reasonable doubt the defendant was guilty of first-degree murder. The defendant was the last person to be seen with Rochelle Barry. Sara Tomson, Rochelle's friend, and Gail Bartlett, a disinterested witness, both observed the defendant and Rochelle walk straight back into the woods from where Sara's car was parked. Sara testified Rochelle went into the woods with the defendant at 3:05 a.m. on Saturday, August 19, 1989. Rochelle was never seen alive again. Neither Sara nor Gail ever saw anyone else go into or come out of that wooded area.

At about 6:20 a.m. on that Saturday morning, Officer Rathbone discovered Rochelle's clothing in an area straight back into the woods from where Sara's car was parked and in the line which the defendant and Rochelle walked into the wooded area a few hours earlier. When the clothes were found scattered on the ground in the woods, Rochelle's jeans were ripped on the sides, her bra was in pieces and the straps were removed from the cups, her underwear was ripped on the sides, and her shirt had two blood spots on it. Rochelle's socks and shoes were in the same area. The grass in the area where the clothing was found was matted down, as if someone had been lying in it.

The officer found footprints leading away from the area where the clothing was discovered. The soil in this area is a dirt and sand mixture. The pattern of the footprints was very similar to the pattern on the soles of the defendant's shoes which he was wearing on the night of August 18, 1989, and on the morning of August 19,

1989. The police also discovered some bare footprints alongside the shoe prints leading away from this area. The officers followed the footprints down across the main road and along the long sand pit to a path where Rochelle's body was found two weeks later. They found some footprints leading out of the area where Rochelle's body was ultimately found. The footprints then went across to where a fence is, up a dike, and in the direction of Easton Avenue.

At about 7:30 a.m. on Saturday, August 19, 1989, Larry Bierman observed an individual crossing Interstate 380 and then walking into a ditch behind the chain link fence located behind Design Studio flower shop. Mr. Bierman testified the individual crossing I-380 was wearing faded jeans and no shirt. He explained the individual had a light-colored shirt tucked into his jeans pocket. He further testified the individual was walking briskly and kept turning around to see if he was being watched. At approximately 7:38 a.m., Sharon and Michael Bauler observed the defendant walking quickly on I-380 approaching Design Studio. They testified the defendant was coming up on the back side of Design Studio where a fence separates the building from the interstate. They testified he had on black jeans and no shirt. Mr. Bierman and the Baulers observed the defendant in a line that is almost directly in line with Easton Avenue where the footprints last led. At about 7:45 a.m., Lucille Efting saw the defendant cut through her yard on Amherst, a street which is right off of Easton. She testified the defendant was wearing jeans and white tennis shoes and no shirt.

There are numerous inconsistencies in the defendant's story of what happened on the days surrounding Rochelle Barry's disappearance and the testimony of various other witnesses. The defendant told the police detective he never went into the woods at the Mitchell Avenue sand pits on that Friday night and Saturday morning. Both Sara Tomson and Gail Bartlett testified they observed the defendant walk into the wooded area with Rochelle. The defendant claims he went down to the bonfire at the sand pits. Not one person saw the

defendant at the bonfire. The defendant claims he was mingling around the area of Boise Street. Not one person saw the defendant near Boise Street. The defendant told the police two girls drove him around Waterloo/Cedar Falls and then dropped him off near the intersection of Ansborough and Maynard Avenue, a few blocks from his home. He could not remember the girls' names, and he could not remember what type of car they were driving. He also could not remember what time he got home but he noticed it was starting to get light outside. A meteorologist testified the official sunrise on August 19, 1989, was at 6:20 a.m. but that some light was visible as early as 5:35 a.m. The police could not find any leads as to the identity of these two girls who allegedly drove the defendant home. Moreover, as previously mentioned, four different people saw the defendant walking across I-380 away from the sand pits, near Easton, and up around Amherst in the direction of his home between 7:30 a.m. and 8:00 a.m. This evidence blatantly contradicts his story that two girls dropped him off near his house as it was starting to get light outside.

The defendant claims he fell asleep watching M-TV and then Officer Piper woke him up to go down to the police station. Officer Piper testified she went to the defendant's residence on Maynard Avenue at approximately 7:30 a.m. and found no one at home. She further testified that when she returned to the residence at approximately 9:15 a.m. the back door was ajar and the defendant immediately came out of the house to see what she wanted. Furthermore, Melissa Watson, the defendant's girlfriend, testified the defendant called her at 8:45 a.m. from a phone booth at a Sinclair Station near his house and told her he had just returned home "a little while ago." It is clear the officer did not wake the defendant up when she arrived at his residence at 9:15 a.m. because only thirty minutes before he had been at a phone booth calling Melissa. Additionally, the police did not find the defendant's television on the M-TV channel as if the defendant had fallen asleep watching that channel.

When questioned by the police on Saturday morning, the defendant claimed the new clean white shirt he was wearing at the time of the questioning was the same shirt he had worn Friday night and earlier that morning while at the sand pits. But, all of the people who saw the defendant on Friday night and Saturday morning claim he was wearing a white tank top which had a blue Shagnasty's logo on it, black jeans, and white leather hightop Reebok shoes. The police found the black jeans, socks, and leather Reeboks in the defendant's washing machine later that day. On Saturday morning at approximately 9:15 a.m., Melissa went to the defendant's residence because the defendant asked her to stop by on her way to work. However, the defendant was not home. At this time, Melissa noticed the washing machine was running. She also found the Shagnasty's shirt and took it from the defendant's residence thinking it belonged to her. When the police retrieved the Shagnasty's shirt from Melissa, it was dingy and covered with grass stains, dirt, and a blood spot.

The defendant claims the scratches, located all over his body on Saturday morning, he received from work. However, the record is clear the defendant had not worked for ten to eleven days, and Dr. Albert Dolan testified the scratches located on the defendant's body on the morning of August 19, 1989, were only six to eight hours old. The doctor also testified various scratches on the defendant's body were inflicted with fingernails of a hand scraping across that part of the body.

The two blood spots on Rochelle's shirt and the one blood spot on the defendant's shirt are consistent with the defendant's blood type and are inconsistent with Rochelle's blood type.

Thomas Ogle, an inmate at the Black Hawk County Jail during the fall of 1989, testified he asked the defendant if he had killed "the girl" (Rochelle). He testified the defendant then became upset and stated he was accidentally wrestling around with her, they fell, and she hurt herself. Ogle then explained when the defendant mentioned "wrestling around" he was probably referring to having sex. Eddie Johnson, another inmate, testified that during a Bible study the defendant asked some of his cell mates whether God forgives all sins and, specifically, whether God forgives for *murder*. Johnson testified the defendant became very upset and "a nervous wreck" when the local newscast reported the body of Rochelle Barry had been found. According to Johnson, the defendant could not eat and had the shakes. Johnson further explained, later that night, after hearing the news story of Rochelle's body being discovered, the defendant was crying and saying "it was an accident, I didn't mean it."

Based on the overwhelming evidence, I find a reasonable jury could convict the defendant of first-degree murder. I find the individual instances of error discussed by the majority were each harmless and do not compel reversal. *See State v. Reed*, 482 N.W.2d 672, 675 (Iowa 1992); *See also State v. Holland*, 485 N.W.2d 652, 655–56 (Iowa 1992). I also do not find the defendant was prejudiced by a cumulative effect of error. A defendant is not denied a fair trial through the cumulative effect of individual instances of claimed errors by trial court, where the "defendant ... failed to demonstrate any prejudice from any [particular] asserted error during the trial.... Because no prejudice existed, he did not establish he was denied a fair trial by an accumulation of prejudice." *State v. Pierce*, 287 N.W.2d 570, 575 (Iowa 1980).

I am unable to conclude the defendant did not receive a fair trial. I find there is overwhelming evidence the defendant is guilty of first-degree murder and I would affirm his conviction.