STATE of Iowa, Plaintiff–Appellee,

v.

John CASTANEDA, Defendant–
Appellant.

No. 98–0835.

Supreme Court of Iowa.

Jan. 18, 2001.

Linda Del Gallo, State Appellate Defender, and Stephan J. Japuntich, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Thomas S. Tauber, Assistant Attorney General, Thomas S. Mullin, County Attorney, and Paul E. Kittredge, Jr., Assistant County Attorney, for appellee.

LAVORATO, Chief Justice.

A jury convicted John Castaneda of sexual abuse in the second degree of his ten-year-old adopted daughter. He appealed from the judgment of conviction and sentence, contending that the district court abused its discretion in admitting damaging testimony from his former wife. He also contends the district court violated his Sixth Amendment right to confrontation when it allowed into evidence a videotaped interview of the daughter and a transcript of that interview. We transferred the case to the court of appeals, which affirmed. On further review of the court of appeals decision, we vacate that decision, reverse the judgment of conviction and sentence, and remand for a new trial.

**I. Background Facts and Proceedings.**

In the early 1990s, Castaneda and his former wife, Patricia Johnson, moved to Sioux City, Iowa, from California. In Sioux City, Castaneda worked as a substitute teacher and later became a full-time teacher at a Sioux City elementary school.

In 1992 Castaneda and Johnson became foster parents to S.C. and her brother, M.C. Johnson worked at night, leaving Castaneda alone with the children. On occasions when Johnson returned from work, she found S.C. sleeping in Castaneda's room, sometimes while Castaneda was sleeping there too.

On several occasions, Johnson saw Castaneda and S.C. together in bed. This angered Johnson, and she talked to Castaneda about it. The practice, however, continued.

In 1994 Castaneda and Johnson were in the process of adopting S.C. and M.C. During this time, Johnson moved out of the home, and eventually she divorced Castaneda. Castaneda, however, went forward with the adoption, which the district court finalized in 1995.

Before the adoption became final, S.C. told a grade-school friend that Castaneda had raped her. As a foster care parent, Castaneda was a mandatory reporter. As such, he felt legally bound to report the allegation to the Iowa Department of Human Services, which he did. The department determined the accusation was unfounded.

Later, the department received a complaint that Castaneda had physically abused S.C. It was during this investigation that the allegations of sexual abuse in question surfaced. The department reported the complaint to the police, after which S.C. and M.C. were removed from Castaneda's home.

On May 8, 1996, the police had the Marion Health Center Child Protection Center interview S.C. Janet Kircher, a social worker employed at the center, conducted the interview, which was videotaped. During the interview, S.C. related that over the past two years, beginning when she

was eight years old, Castaneda had on five to seven occasions committed various sex acts upon her or looked at her while she was naked.

Dr. Patrick James Duey conducted a medical examination of S.C. and determined the examination was consistent with a Class 3 examination. A Class 3 examination is classified as one that is suspicious for abuse.

Based on the interview and the medical examination, the State charged Castaneda on June 3 with three counts of sexual abuse in the second degree, see Iowa Code §§ 702.17, 709.1, 709.3(2) (1995), a class B felony, and one count of indecent contact with a child, see Iowa Code § 709.12, an aggravated misdemeanor.

On December 3 Castaneda's attorney attempted to depose S.C. During the deposition, S.C. was uncooperative and frequently tried to evade answering the attorney's questions. She said she did not want to talk about the alleged sexual abuse. S.C. referred the attorney to her videotaped interview. Although she often said that she did not remember, S.C. did answer some of the attorney's questions about the alleged sex acts that Castaneda supposedly had committed.

On February 17, 1997, the State filed a "Notice of Intent to Use Videotape" pursuant to Iowa Rules of Evidence 803(24) and/or 804(b)(5), and Iowa Code section 910A.14(3) (providing that recorded statements of a child describing sexual contact with or on the child may be admitted if the statements substantially comport with the requirements for admission under Iowa Rule of Evidence 804(b)(5), the residual hearsay exception). In its motion, the State noted that a probability existed that S.C. would be deemed "unavailable" pursuant to Iowa Rule of Evidence 804(a).

Castaneda argued that the State had not shown that S.C. was "unavailable" to testify. For that reason, Castaneda insisted that, if the court allowed the State to use the videotaped interview, such use would

violate his Sixth Amendment right to confrontation.

Following a hearing, district judge Dewie J. Gaul found the videotaped interview met the requirements of the rule regarding the residual hearsay exception. The judge also found that the videotaped interview was more probative than the deposition testimony that was filled with the child's reluctance to talk and unwillingness to give answers. However, the judge declined to rule on the admissibility of the videotaped interview at this time, pending a determination at the time of trial as to whether S.C. was unavailable to give live testimony.

On April 3 district judge Michael S. Walsh presided over a second hearing on the admissibility of the videotaped interview. The judge reviewed the videotape, a report from Dr. Richard C. Brown—a doctor who had interviewed S.C.—and the deposition. The judge, over Castaneda's objections, concurred with judge Gaul's ruling. Judge Walsh also found that S.C. was "unavailable" to testify at trial and ruled that the State would be allowed to admit the videotaped interview to the extent it was otherwise admissible.

On April 27 the parties tried the case to the jury. Because the jury was unable to reach a unanimous verdict, the court granted Castaneda's motion for mistrial.

On January 13, 1998, before the start of the second trial, Castaneda filed a motion asking the district court to reconsider whether S.C. was unavailable to testify. Castaneda also asked the court to rule that the proposed testimony of Patricia Johnson concerning sex acts she allegedly performed on him while he was observing children was irrelevant, as well as unfairly prejudicial, and therefore inadmissible.

District judge Phillip S. Dandos presided over the hearing on Castaneda's motion and the second trial. The hearing on the motion was held immediately prior to the beginning of the second trial on March 16, 1998. In addition to the previous rulings

by judges Gaul and Walsh, judge Dandos considered a letter from S.C.'s therapist, social worker Doreen M. Loeffelholz. Based upon this letter and the previous findings of judges Gaul and Walsh, judge Dandos held that S.C. was "currently unavailable to testify at trial; that were she brought in to testify that this would be damaging to her and that it would add little, if anything, to the evidence in this case." Judge Dandos ruled the videotaped interview and transcript of that interview were admissible.

At the hearing, Castaneda's attorney did not object to the therapist's letter and, in fact, waived any objection to the admission of the videotaped interview and transcript.

Over Castaneda's objections, judge Dandos also ruled that Patricia Johnson's testimony was admissible. Judge Dandos concluded that Johnson's testimony was admissible only to the extent that it "goes to intent."

On March 24 the jury returned verdicts of not guilty on all charges except as to one count of sexual abuse in the second degree. The court sentenced Castaneda to an indeterminate twenty-five-year term.

This appeal presents two issues. First, did the district court abuse its discretion in allowing Johnson's testimony about the sex acts she allegedly performed upon Castaneda? Second, did the district court violate Castaneda's Sixth Amendment right to confrontation when it admitted into evidence S.C.'s videotaped interview and a transcript of that interview?

## II. Evidence of Prior Sexual Acts With One Other Than the Victim.

**A. The parties' contentions.** In a hearing on a pretrial motion, Castaneda objected to Johnson's testimony about the alleged oral sex acts she performed upon Castaneda on two different occasions while he was allegedly observing children playing. He contended that the testimony was irrelevant under Iowa Rules of Evidence 401 and 402. He contended further that,

even if relevant, the probative value of this evidence was outweighed by its unfairly prejudicial nature under Iowa Rule of Evidence 403. Finally, he contended such testimony constituted character evidence governed by Iowa Rule of Evidence 404 and not admissible.

The State contended that the testimony was admissible under rule 404(b) to show intent. Over Castaneda's objections, the district court allowed the testimony.

Specifically, the court ruled that the testimony would be "strictly limited to the purpose of showing any intent on the part of the defendant to commit the crimes alleged."

On appeal, Castaneda reasserts the objections to Johnson's testimony that he made in the district court. The State asserts that the district court did not abuse its discretion in admitting her testimony because the activity Johnson described indicated that Castaneda was fantasizing about having sexual activity with children. The State therefore asserts that Johnson's testimony was relevant as to intent to have indecent contact with S.C. Additionally, the State asserts that, even if prejudicial, Johnson's testimony was not unfairly prejudicial.

**B. Applicable law.** Iowa Rule of Evidence 404(b) provides that

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The rule is a codification of our common-law rule that one crime cannot be proved by proof of another. The purpose of the common-law rule was to "exclude from the jury's consideration evidence which has no relevancy except to show that the defendant is a bad person and thus likely com-

mitted the crime in question." *State v. Cott*, 283 N.W.2d 324, 326 (Iowa 1979). Under the common law, evidence that was "relevant to prove some fact or element in issue other than the defendant's criminal disposition escape[d] the rule's prohibition." *Id.* This court accordingly recognized certain categories of permissible objectives for proof of prior criminal acts. *Id.* These categories included:

> "(1) motive, (2) intent, (3) absence of mistake ₀or accident, (4) a common scheme or system of criminal activity embracing the commission of two or more crimes so related that proof of one tends to prove the other, (5) identity of the person charged with the commission of a crime."

*Id.* (quoting *State v. Folkens*, 281 N.W.2d 1, 5 (Iowa 1979)).

Under rule 404(b), we continue to recognize that there must be some factual issue raised to permit evidence of other crimes, wrongs, or acts under the noted exceptions. *See State v. Plaster*, 424 N.W.2d 226, 229 (Iowa 1988). If the evidence meets this test, it is prima facie admissible, even though the evidence's tendency is to demonstrate the defendant's bad character. *Plaster*, 424 N.W.2d at 229.

In determining whether the challenged evidence is admissible, the district court must employ a two-step analysis. *Id.* The court must first decide whether the evidence is relevant. *Id.* If it is not relevant, then the challenged evidence is inadmissible. Iowa R. Evid. 402 ("Evidence which is not relevant is not admissible."). However, if the court finds that the challenged evidence is relevant, the court must then decide whether the evidence's probative value is substantially outweighed by the danger of unfair prejudice. Iowa R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...."); *Plaster*, 424 N.W.2d at 231; *see also Cott*, 283 N.W.2d at 328–29 (employing a similar two-step analysis under the common-law rule). "An affirmative finding in this balancing process precludes admissibility of even relevant evidence." *Plaster*, 424 N.W.2d at 231. In employing the two-step analysis, the district court must exercise its discretion. *Id.* at 229. We will reverse its decision only when we find a clear abuse of discretion. *Id.*

**C. Analysis.** We assume without deciding that Johnson's testimony was relevant. However, for reasons that follow, we believe the testimony was unfairly prejudicial, and the district court abused its discretion in admitting it into evidence.

Evidence is relevant when it has "any tendency to make the existence of any fact that is of *consequence* to the determination of the action more probable or less probable than it would be without the evidence." Iowa R. Evid. 401 (emphasis added). All relevant evidence is admissible except for certain exceptions not applicable here. Iowa R. Evid. 402.

Even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice...." Iowa R. Evid. 403. Probative value gauges the strength and force of relevant evidence. *Plaster*, 424 N.W.2d at 231.

"Unfair prejudice" in rule 403 is defined as " 'an undue tendency to suggest decisions on an improper basis, commonly though not necessarily, an emotional one.' " *Id.* (quoting Fed.R.Evid. 403 advisory committee's note). Evidence, therefore, that

> "appeals to the jury's sympathies, arouses its sense of horror, provokes its instincts to punish, or triggers other mainsprings of human action may cause a jury to base its decision on something other than the established propositions in the case. The appellate court may conclude that 'unfair prejudice' occurred because an insufficient effort was made below to avoid the dangers of prejudice,

or because the theory on which the evidence was offered was designed to elicit a response from the jurors not justified by the evidence."

*Id.* at 231–32 (quoting 1 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 403[03], at 403–33–40 (1986)).

As mentioned, the State charged Castaneda with three counts of sexual abuse in the second degree and those counts included the following acts: (1) contact between his finger or hand and S.C.'s genitalia (count I), (2) contact between his genitalia and her genitalia (count II), and (3) contact between his mouth and her genitalia (count III). The State also charged Castaneda with indecent contact with a child (count IV) in that he "fondled or touched the breast" of S.C. "with the specific intent to arouse or satisfy" his sexual desires or those of S.C.

As to count IV (indecent contact with a child), the district court instructed the jury that the State was required to prove that Castaneda "fondled or touched the breast" of S.C. "with the *specific intent* to arouse or satisfy" his sexual desires or those of S.C. (Emphasis added.) As to the remaining three counts, the court instructed the jury that the State was required to prove that Castaneda "performed a sex act with [S.C.]" by the conduct specified in counts I, II, and III. In the specific intent instruction, the court instructed the jury that "specific intent" means doing an act "with a specific purpose in mind." Additionally, in this instruction, the court told the jury that "[i]t is only necessary to prove specific intent regarding the crime of indecent contact with a child under count IV and is not necessary under counts I, II, and III."

In support of its contention that Johnson's testimony was admissible under rule 404(b), the State argues that it had to prove Castaneda's specific intent in order to convict him of indecent contact with a child. The State further argues that Johnson's testimony "had significant probative value to prove Castaneda's intent and to allay any doubt that Castaneda touched S.C.'s breast accidentally, or that S.C. misinterpreted an innocent action." Finally, the State argues that "although Johnson's testimony may have prejudiced Castaneda's case, it bore on a legitimate issue and was not unfairly prejudicial."

Johnson's testimony, to the extent it had any probative value, bore on Castaneda's specific intent—the consequential fact—an element in count IV.

The jury did not convict Castaneda of count IV, the count requiring specific intent. Rather the jury convicted Castaneda of only one count—count III (contact between his mouth and her genitalia) and found him not guilty on the remaining counts. This is significant because this act is similar to the act Johnson claimed she performed on Castaneda while he was observing children. The jury likely inferred from this testimony that Castaneda (1) was sexually fantasizing about children at the same time he was relieving himself sexually and (2) would therefore be prone to engage in similar acts with a child, in this case, S.C. While it is tempting to draw such an inference, it is precisely this kind of character inference that rule 404(b) was designed to prevent a jury from drawing. Obviously, Johnson's testimony—which was in the context of children—would arouse a jury's sense of horror and would provoke its instinct to punish and base its decision on this testimony rather than on the issue of specific intent.

As one court wisely observed concerning prior acts evidence:

When jurors hear that a defendant has on earlier occasions committed essentially the same crime as that for which he is on trial, the information unquestionably has a powerful and prejudicial impact. That, of course, is why the prosecution uses such evidence whenever it can. When prior acts evidence is introduced, regardless of the stated purpose, the likelihood is very great that the jurors will use the evidence precisely for the purpose it may not be considered[:] to

suggest that the defendant is a bad person, a convicted criminal, and that if he "did it before he probably did it again." *United States v. Johnson,* 27 F.3d 1186, 1193 (6th Cir.1994).

In the same vein, one writer suggests that when prosecutors rely on uncharged conduct to prove intent

> there is a grave risk that the jurors will be tempted to return a guilty verdict on an improper basis. Evidence of the accused's uncharged misconduct is potentially prejudicial because the jurors perceive the uncharged conduct as immoral and consequently react adversely to the accused. For the most part, it is the accused's wrongful intent which gives the conduct its perceived immoral quality. As Shakespeare wrote, "[T]here is nothing either good or bad, but thinking makes it so." When a writer wants to express the thought that a person has a criminal disposition, the writer frequently describes the person as a "criminal mind"—rather than a criminal arm or leg. Suppose that the jury concludes that the accused has a warped mind inclined to criminal intent. That conclusion can cause the jurors to experience the very type of revulsion which the character evidence prohibition is designed to guard against.

Edward J. Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea: The Doctrines Which Threaten to Engulf the Character Evidence Prohibition,* 51 Ohio St. L.J. 575, 583 (1990).

The State contends there was no prejudice. In support of its contention, the State points out the following. First, the district court's limiting instruction told the jury that they could use Johnson's testimony only to determine Castaneda's intent. Second, the court also instructed the jury that the State had to prove intent with respect to the charge of indecent contact, but not with respect to the three charges of second degree sexual abuse. Last, because the jury found Castaneda not guilty

of indecent contact, the State argues that under the court's instruction the jurors could not make any further use of Johnson's testimony.

The specific intent instruction did advise the jury that the State only had to prove specific intent regarding the crime of indecent contact with a child under count IV and it was not necessary to prove such intent under counts I, II, and III. Contrary to the State's assertion, however, nowhere in the instructions, did the court tell the jury that it could not consider Johnson's testimony on the other three charges under counts I, II, and III. In fact, the district court's limiting instruction as worded actually permitted the jury to consider her testimony on *all* the charges. One of those charges included the very one of which Castaneda was convicted. On this point, the limiting instruction stated: "You may use [Johnson's testimony] only for the purpose of determining the defendant's intent to commit the *crimes* alleged."

Moreover, even had the district court given a correct limiting instruction, we think it would not have removed the unfairly prejudicial nature of Johnson's testimony. Her testimony was so inherently prejudicial that no amount of admonition by the court was sufficient to remove the prejudice.

In *State v. Marvin,* 197 Iowa 443, 197 N.W. 315 (1924), the State had charged the defendant with lascivious acts with a child. The trial court withdrew from the jury's consideration evidence of similar prior bad acts with another child. *Id.* at 444, 197 N.W. at 315–16. On appeal, this court granted a new trial, holding that, given the nature of the testimony, the trial court's action was not enough to remove the harmful effect of such testimony to the defendant. *Id.* at 444, 445, 197 N.W. at 316. On this point, the court said:

> Did the withdrawal of the questioned testimony from the consideration of the jury cure the error of its admission in

the first instance? We think not, and the reason is obvious. The evidence would leave in the minds of the jurors the impression of the defendant's proneness to do such things, and the knowledge which the jury had received in relation to the acts of the defendant with another girl could not be erased by a mere direction on the part of the trial court, when it was determined that such evidence should be held inadmissible.

*Id.* at 445, 197 N.W. at 316. We think the same can be said here. *See also State v. Hardy,* 492 N.W.2d 230, 234 (Iowa App. 1992) (holding that because of substantial unfairly prejudicial nature of prior assault convictions, curative instruction that the jury could consider the evidence for the limited purpose of showing defendant's intent was inadequate to alleviate the unfair prejudice).

Because the probative value of Johnson's testimony was substantially outweighed by the danger of unfair prejudice, we reverse Castaneda's conviction and remand for new trial. As this case must be retried, we address another issue that may arise on retrial.

## III. The Sixth Amendment Right to Confrontation: The Videotaped Interview and Interview Transcript.

**A. The parties' contentions.** Castaneda contends the district court denied him his constitutional right to confront witnesses against him when the court ruled that the jury would be allowed to view S.C.'s videotaped interview and consider the transcript of that interview.

Because Castaneda's trial counsel did not object to the admission of the videotaped interview and the transcript, Castaneda's appellate counsel has argued the confrontation issue in the context of an ineffective-assistance-of-counsel claim. As mentioned, this case must be retried. We therefore dispense with an analysis of the ineffective-assistance-of-counsel claim and proceed to consider the issue for guidance on retrial.

The State concedes that the videotaped interview was hearsay. However, the State contends no constitutional violation occurred. In support of its contention, the State relies on the residual exception for hearsay found in Iowa Rule of Evidence 804(b)(5).

Our review of Castaneda's constitutional right to confrontation is de novo. *See State v. Rojas,* 524 N.W.2d 659, 662 (Iowa 1994).

**B. Applicable law.** Iowa Rule of Evidence 802 provides that "[h]earsay is not admissible except as provided by the Constitution of the State of Iowa, by statute, by [the rules of evidence], or by other rules of [this court]."

Iowa Rule of Evidence 804(b)(5) provides:

> The following are not excluded by the hearsay rule if the declarant is *unavailable* as a witness:
>
> . . . .
>
> (5) A statement not specifically covered by any of the foregoing exceptions but having the equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

(Emphasis added.) The State contends S.C. was "unavailable" under Iowa Rule of

Evidence 804(a)(4), which provides that a declarant is unavailable when the declarant "is unable to be present or to testify at the trial or hearing because of death or *then existing physical or mental illness or infirmity.*" (Emphasis added.) The district court concluded that S.C. was unavailable because the evidence showed she suffered from posttraumatic stress disorder related to the alleged sexual abuse.

The Sixth Amendment to the Federal Constitution guarantees that "in all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. The Sixth Amendment is binding on the states through the Fourteenth Amendment to the Federal Constitution. *Idaho v. Wright,* 497 U.S. 805, 813, 110 S.Ct. 3139, 3145, 111 L.Ed.2d 638, 651 (1990).

■ Although the Supreme Court has recognized that hearsay rules and the Confrontation Clause are generally designed to protect similar values, the Court does not equate the Confrontation Clause's prohibitions with the general rule prohibiting the admission of hearsay statements. *Id.* at 814, 110 S.Ct. at 3146, 111 L.Ed.2d at 651; *Rojas,* 524 N.W.2d at 664. In other words, the Confrontation Clause bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule. *Id.*

In *Ohio v. Roberts,* the Court recognized that, if the clause were read literally, it would require, on objection, the exclusion of any statement made by a declarant not present at trial. 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597, 605 (1980). The Court also recognized that, if the clause were applied in this manner, every hearsay exception would be abrogated, a result the Court has "long rejected as unintended and too extreme." *Id.* at 63, 100 S.Ct. at 2537, 65 L.Ed.2d at 605–06. Relying on prior precedent and policies supporting the clause, the Court, however, noted that the clause was intended to exclude some hearsay. *Id.* at 63, 100 S.Ct. at

2537, 65 L.Ed.2d at 606. The two important policies underlying the clause, according to the Court, was a preference for face-to-face confrontation at trial and the right of cross-examination. *Id.*

Nevertheless, the Court recognized that competing interests "may warrant dispensing with confrontation at trial." *Id.* at 65, 100 S.Ct. at 2538, 65 L.Ed.2d at 607; *accord Rojas,* 524 N.W.2d at 664. To accommodate these competing interests, the Court adopted "a general approach" for determining when incriminating statements admissible under an exception to the hearsay rule also meet the requirements of the Confrontation Clause. *Roberts,* 448 U.S. at 65, 100 S.Ct. at 2538, 65 L.Ed.2d at 607; *Rojas,* 524 N.W.2d at 664. The Court noted that the Confrontation Clause "operates in two separate ways to restrict the range of admissible hearsay." *Id.* "First, in conformance with the Framers' preference for face-to-face accusation, ... the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Roberts,* 448 U.S. at 65, 100 S.Ct. at 2538, 65 L.Ed.2d at 607; *accord Rojas,* 524 N.W.2d at 664.

Second, once a witness is shown to be unavailable, the witness' statement is admissible only if the statement "bears adequate 'indicia of reliability.'" *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539, 65 L.Ed.2d at 608; *Rojas,* 524 N.W.2d at 664. Reliability, according to the Court, "can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." *Id.* In other cases, the Court insisted, "the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id.*

Applying this general framework of analysis, the Court in *Roberts* held that the admission of testimony given at a preliminary hearing, in which the declarant failed to appear at trial despite the State's issuance of five separate subpoenas to her, did

not violate the Confrontation Clause. 448 U.S. at 66–77, 100 S.Ct. at 2540–45, 65 L.Ed.2d at 609–15. The Court found that (1) the State had carried its burden of showing that the declarant was unavailable to testify at trial, and (2) the testimony at the preliminary hearing bore sufficient indicia of reliability because defense counsel had an adequate opportunity to cross-examine the declarant. *Id.*

In *Wright,* the Supreme Court applied the *Roberts* framework of analysis to hearsay statements of a three-year-old victim of sexual abuse. The trial court found, and defense counsel agreed, that the child was incapable of communicating with the jury. For that reason, the Supreme Court assumed the child was an unavailable witness within the meaning of the Confrontation Clause. *Wright,* 497 U.S. at 816, 110 S.Ct. at 3147, 111 L.Ed.2d at 652.

The remaining question in *Wright* was whether the child's incriminating statements to a doctor bore sufficient indicia of reliability to withstand scrutiny under the Confrontation Clause. The trial court had admitted the statements under the residual hearsay exception. As to the issue of "indicia of reliability" the Court first noted that the residual exception is not a firmly rooted hearsay exception for Confrontation Clause purposes. *Wright,* 497 U.S. at 817, 110 S.Ct. at 3147–48, 111 L.Ed.2d at 653; *Rojas,* 524 N.W.2d at 664. For that reason, the child's incriminating statements were therefore " 'presumptively unreliable and inadmissible for Confrontation Clause purposes.' " *Wright,* 497 U.S. at 818, 110 S.Ct. at 3148, 111 L.Ed.2d at 654 (quoting *Lee v. Illinois,* 476 U.S. 530, 543, 106 S.Ct. 2056, 2063, 90 L.Ed.2d 514, 528 (1986)). The State was therefore required to show that the child's incriminating statements had "particularized guarantees of trustworthiness" that must be shown from "the totality of the circumstances." *Id.* at 819, 110 S.Ct. at 3139, 3148, 111 L.Ed.2d at 655; *Rojas,* 524 N.W.2d at 664.

According to the Court, the relevant circumstances include "only those that sur-round the making of the statement and that render the declarant particularly worthy of belief." *Id.* The Court noted that its precedents recognized that statements admitted under a "firmly rooted" hearsay exception (for example an excited utterance and dying declaration) are so trustworthy that adversarial testing would add little to their reliability. *Wright,* 497 U.S. at 820–21, 110 S.Ct. at 3149, 111 L.Ed.2d at 656. By adversarial testing, the Court obviously meant face-to-face confrontation and cross-examination. The Court then imposed the condition that "evidence possessing 'particularized guarantees of trustworthiness' ... must similarly be so trustworthy that adversarial testing would add little to its reliability." *Id.* at 821, 110 S.Ct. at 3149, 111 L.Ed.2d at 656.

The Court went on to identify several nonexclusive factors that relate to whether hearsay statements made by a child witness in child sexual abuse cases are reliable but declined to endorse a mechanical test for assessing trustworthiness. Rather, the Court decided that trial courts should have considerable leeway to consider other appropriate factors on a case-by-case basis. *Id.* at 822–23, 110 S.Ct. at 3150, 111 L.Ed.2d at 656–57; *Rojas,* 524 N.W.2d at 664. These factors (1) bear on "whether the child declarant was particularly likely to be telling the truth when the statement was made" and (2) do not include corroborating evidence. *Wright,* 497 U.S. at 822, 110 S.Ct. at 3150, 111 L.Ed.2d at 656–57; *Rojas,* 524 N.W.2d at 664–65. Of the factors the trial court relied on, the Supreme Court found only two relevant: "whether the child had a motive to 'make up a story of this nature,' and whether, given the child's age, the statements are of the type 'that one would expect a child to fabricate.' " *Wright,* 497 U.S. at 826, 110 S.Ct. at 3151, 111 L.Ed.2d at 659.

■ Based on the decision in *Wright,* we conclude that, if a trial court finds that (1) a residual hearsay statement has particularized guarantees of trustworthiness, and (2) the declarant is unavailable to tes-

tify, the statement is admissible even in the absence of face-to-face confrontation and cross-examination. We reached the same conclusion in *Rojas,* 524 N.W.2d at 663.

**C. Analysis.** Here, the district court had to decide two issues. One, was S.C. unavailable under rule 804(a)(4) (providing that declarant is "unable to be present or to testify at trial or hearing because of death or then-existing physical or mental illness or infirmity")? Two, did the video-taped interview have the "particularized guarantees of trustworthiness" required of a residual hearsay statement?

As mentioned, just before the second trial started, judge Dandos ruled that S.C. was unavailable to testify at trial. He based his ruling in part on a recent letter from social worker Doreen M. Loeffelholz, S.C.'s therapist. Loeffelholz noted that Castaneda's alleged sexual abuse of S.C. was being addressed in therapy, but that S.C.

remains very resistive to talking about this.... She becomes very anxious when I approach the subject. Consistently, [S.C.'s] mood, attitude, and behavior clearly convey her extreme uncomfortableness with any conversation or questions related to sexual abuse, John Castaneda, or even the basic subject of sex. She reacts very strongly to the terms "sexual abuse," "sex," and even to Mr. Castaneda's name. She has asked if I would refer to them by other "code words." Her overall preference would be that we not even talk about "it" at all.

The various times that I have approached [S.C.] about testifying ... she consistently verbalizes that she does not want to do so because (1) she's "mad" that people want to make her do something she's not comfortable with, (2) she's "mad" and "sad" about how her life has been affected by "all of this," and (3) she feels "icky" (i.e.: violated and taken advantage of by John Castaneda), and (4) she is scared to see John Castaneda,

describing that her stomach gets upset and she feels like she "could throw up."

. . . .

It seems clear that [S.C.] would suffer trauma from having to testify either in John Castaneda's presence, or by closed circuit camera where he is observing, but not present. [S.C.'s] intense feelings would create tremendous difficulty with testifying in court and Mr. Castaneda's presence would likely retraumatize her in the emotionally vulnerable state that she is in. It is also unlikely that she would be able to communicate the offenses that occurred, and as stated previously, she has expressed her unwillingness to talk about these offenses. If forced, additional physiological and psychological harm would occur.

The State relies on cases from several jurisdictions which have held that a "psychologically unavailable" witness is unavailable for purposes of the Confrontation Clause. We discussed several of these cases in *State v. Gregg,* 464 N.W.2d 431 (Iowa 1990). However, we ultimately concluded that the facts made that case "an inappropriate case to decide whether to adopt a 'psychologically unavailable' justification for substituting a deposition for trial testimony." *Gregg,* 464 N.W.2d at 433.

We noted in *Gregg* that "those jurisdictions that subscribe to the theory apply it with some reluctance, and only in rare circumstances." *Id.* at 432. We also noted one court held that " 'psychological unavailability must exist to such a degree as to render the witness' attendance, or his testifying, relatively impossible and not merely inconvenient.' " *Gregg,* 464 N.W.2d at 432–33 (quoting *People v. Gomez,* 26 Cal. App.3d 225, 230, 103 Cal.Rptr. 80, 83–84 (1972)).

The United States Supreme Court has not articulated specific requirements for the determination of "psychological unavailability." Nevertheless, we think it is certain, given the serious constitutional implication of the potential loss of a

fundamental right, that the standard must necessarily be high. However, one cannot dispute that it is extremely difficult to accurately predict a person's response to psychological trauma. Therefore, while we must closely guard a defendant's rights, we must carefully balance those rights against the real potential for harm to tender, and as yet not fully developed, psyches. With this concern in mind, we adopt the stringent *Gomez* standard of "relatively impossible and not merely inconvenient." In applying this standard, trial judges should take into consideration the following factors set forth in *Warren v. United States:*

> (1) the probability of psychological injury as a result of testifying, (2) the degree of anticipated injury, (3) the expected duration of the injury, and (4) whether the expected psychological injury is substantially greater than the reaction of the average victim of a rape, kidnapping or terrorist act.... The factors should be weighed in the context of each other, as well as in the context of the nature of the crime and the preexisting psychological history of the witness.

436 A.2d 821, 830 n. 18 (1981).

In *Warren,* the trial court excused a rape victim from testifying because the medical experts agreed that she "would undergo far greater mental anguish than normally accompanies court appearances of the victims of rapes ... and that her appearance in court ... would be likely to lead to severe psychosis, even possible suicide." *Id.* at 828. There was ample record evidence that the witness had suffered severe depression that had reached suicidal levels. *Id.* Additionally, independent psychiatric evaluation of the witness supported the trial court's decision, and this independent witness concurred with the opinion of the State's expert witness. *Id.* at 828–29.

We think the following passage in *Warren* aptly sums up our feeling as to when it is appropriate to apply the theory of psychological unavailability:

> We do not intend to sanction a new category of medical unavailability in all cases where witnesses are likely to suffer adverse emotional or psychological effects as a result of testifying against their assailants. But in the extreme circumstances presented here, we agree that the grave risks to the witness' psychological health justify excusing her live in-court testimony. The expert testimony relating to [the victim's] mental health established that there was both a high likelihood of temporary psychological injury, perhaps even psychosis, and a possibility of permanent psychological injury. We are also persuaded of the correctness of the trial court's ruling because of the expert's agreement on the comparative severity of the victim's probable reaction to testifying again.

*Id.* at 829–30 (footnote omitted).

At the time of trial in March 1998, S.C. was twelve. She is now fourteen. Two years have passed since Loeffelholz's examination and letter. By now, S.C. is perhaps able to testify about what allegedly happened to her. On remand, the State will again have the burden to prove S.C. is unavailable if it wants to use the videotaped interview and the transcript of that interview at the retrial of this case. This time the State will be obliged to prove S.C.'s condition meets the test for unavailability we have set out.

■ Given the lapse of time and the fact that we now have adopted a standard for determining psychological unavailability, prudence dictates a new examination of S.C. The examination should cover the *Warren* factors and be detailed enough to allow the district court to determine whether S.C. is psychologically unavailable under the standard we have adopted.

If the district court, in applying the standard, determines S.C. is unavailable, the court will then need to determine if the videotaped interview meets the "particularized guarantees of trustworthiness" ac-

cording to the factors the Supreme Court in *Wright* found appropriate.

We do not imply the factors in *Wright* are the only factors a court may consider. We mentioned some additional factors in *Rojas. See* 524 N.W.2d at 663.

**IV. Disposition.** Because we conclude the district court erred in admitting the challenged testimony of Castaneda's former wife, we vacate the decision of the court of appeals, reverse the judgment of conviction and sentence, and remand for a new trial.

**DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT REVERSED; CASE REMANDED FOR NEW TRIAL.**

All justices concur except SNELL and NEUMAN, JJ., who concur specially, and CADY, LARSON, and TERNUS, JJ., who dissent.

SNELL, Justice (concurring specially).

I concur with the majority opinion holding the case must be reversed and remanded for a new trial. The evidence of the defendant's prior sexual acts with one other than the victim should have been excluded as inadmissible evidence of a character trait under Iowa Rule of Evidence 404(b), and as unfairly prejudicial evidence under Iowa Rule of Evidence 403.

In addition, the evidence should have been excluded as not relevant under the standards established by Iowa Rule of Evidence 401. The prior-acts evidence is dissimilar to the charged offense to which relevancy is claimed. Defendant's engaging in a sex act with his wife was not only legal but did not involve children in any illegal act. The State's assertion of relevancy stretches the word "relevant" in a fashion that would unreasonably admit remotely connected subject matter having sex as a nexus.

NEUMAN, J., joins this special concurrence.

CADY, Justice (dissenting).

I respectfully dissent from the conclusion reached by the majority that the trial court abused its discretion in admitting the evidence of Castaneda's prior sex act. I would conclude the trial court acted within its discretion to admit the evidence.

The majority assumes the disputed evidence was relevant to the specific intent element of the crime of indecent contact with a child. This assumption is correct because the intent or state of mind associated with the prior sex act makes it more probable than not that Castaneda would have had the specific intent to arouse or satisfy his sexual desire if other evidence at trial showed he engaged in the prohibited contact with a child. *See* Iowa Rs. Evid. 401, 404(b). Thus, the fighting question is whether this relevant evidence is nevertheless inadmissible because "its probative value is substantially outweighed by the danger of unfair prejudice." Iowa R. Evid. 403.

I acknowledge a danger of prejudice exists by permitting the jury to hear evidence of Castaneda's prior sex act. However, the danger of unfair prejudice is not enough to exclude evidence under rule 403. The rule requires the probative value of the evidence to be *substantially* outweighed by the danger of unfair prejudice. This means the evidence arouses "hostility or sympathy for one side without regard to the probative value of the evidence." 1 John W. Strong, *McCormick on Evidence* § 185, at 780 (4th ed.1992). Yet, we cannot assume prejudice will occur based simply on the nature of the evidence. Instead, rule 403 requires an assessment of the probative value of the evidence and the degree of danger, followed by a comparison of the two. 2 Clifford S. Fishman, *Jones on Evidence* § 11:12, at 290 (7th ed.1994).

I agree with the majority that the probative value of the prior act evidence is diminished in this case because the specific

intent to engage in the prohibited contact with a child is secondary to whether or not the act occurred. Nevertheless, specific intent remains an element of the crime that the State is required to prove.

On the other hand, the degree of danger posed by the evidence is also diminished. The prior act was not illegal and was factually dissimilar from the act charged. Generally, the greater similarity between the prior act and the crime charged gives rise to a greater risk of unfair prejudice. 3 Clifford S. Fishman, *Jones on Evidence* § 17:93, at 618 (7th ed.1998). In this case, the factual dissimilarity makes it less likely the jury would misuse the evidence to conclude Castaneda committed the crime charged simply because he may have fantasized about children while committing a sex act with an adult. When evidence is dissimilar, there is less likelihood the jury will misuse it to infer guilt.

Additionally, the likelihood that the prior act evidence in this case would generate disgust or shock in such a way to render the jury unable to return a rational verdict is far less than it would be if the prior evidence consisted of an actual sexual abuse of a child. The crime charged in this case is shocking, and most of the evidence to support it will necessarily be shocking. Yet, there is nothing to suggest the jury will react in a particularly strong manner to the particular prior act evidence.

A comparison of the value of the prior act evidence with the fear of prejudice does not produce a clear conclusion that the prior act evidence should be excluded. This conclusion is reinforced by the cautionary instruction given to the jury by the district court and a lack of any indication that the prior act evidence was improperly used in argument.

Our role on appeal in an issue of this nature is not to substitute our judgment for the decision made by the trial judge but to look for a clear abuse of discretion of that decision. We must recognize that the balancing task under rule 403 is difficult, and "[w]ise judges may come to differing conclusions in similar situations." 1 Strong, § 185, at 782. Thus, trial judges are in the best position to make such decisions and should be given "much leeway." *Id.* at 783. The majority has failed to follow this important precept.

LARSON and TERNUS, JJ., join this dissent.